# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00344-CR

**Patrick Anthony Russo, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 9034220, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

### O P I N I O N

Appellant Patrick Anthony Russo appeals his conviction for capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2006).[1] A jury found appellant guilty of capital murder. As a result of the jury's answer at the penalty stage of the trial to the special issue concerning mitigating circumstances, the trial court imposed a life sentence.

### POINTS OF ERROR

Appellant advances eight points of error. In the first and second points, appellant challenges the legal sufficiency of the evidence to establish that the murder was committed in the course of a robbery or in the course of a kidnapping. In points three and four, appellant claims that the evidence was factually insufficient to establish the same issues raised in points one and two. In

---

[1] The current code is cited for convenience. The instant offense occurred on November 15, 2001.

points five and eight, appellant complains of the trial court's evidentiary rulings in admitting irrelevant, prejudicial, and hearsay evidence. In points six and seven, appellant contends that the trial court erred in failing to suppress evidence resulting from the illegal search of appellant's computer and then admitting irrelevant and prejudicial extraneous evidence of the computer's contents.[2] We will affirm the judgment of conviction.

## FACTUAL BACKGROUND

A violent thunder and rainstorm descended upon Austin in the afternoon of November 15, 2001. In the same general time frame, Diane Holik was murdered by ligature strangulation in her own home at 6313 Pathfinder in the Great Hills subdivision in Austin, where she lived alone. Holik's last known telephone conversation occurred at 3:30 p.m. on November 15, 2001, and her computer had been shut down at 3:59 p.m. the same day.

Holik was a supervisory employee of IBM and worked out of her home. She was in daily and weekly contact with certain IBM coworkers across the country in the same supervisory field. They worked as a team in managing new college "hires" for IBM. Holik was engaged to be married and planned to move to Houston where her fiancé lived. She was eager to sell

---

[2] There are no points of error raised regarding the penalty stage of the trial. In fact, appellant did not request that the court reporter's record be included in the appellate record. *See* Tex. R. App. P. 34.6. We have the court reporter's affidavit stating that the penalty stage record is available, but that appellant's first appointed appellate counsel did not request the transcriptions of that portion of the record. Appellant's second and current appointed appellate counsel, in a letter to this Court, states that the first appellate counsel did not request the penalty stage record. Current counsel makes no belated request for the record.

her Austin home. The house was listed with a realtor for $435,000, and there was a "for sale" sign in the front yard.

Teena Fountain, an IBM coworker from Oak Park, Illinois, testified that on the morning of November 16, 2001, she was contacted by coworkers, Diane Kapcar of Dallas and Cynthia Barajas of Los Angeles, California, who reported that Holik had missed a scheduled "meeting," and that they had been unable to contact her by any available means. Knowing that the Austin storm had spawned some tornadoes, Fountain called the Austin Police Department that afternoon asking for a check on Holik.

Austin police officers checked Holik's house about 5:30 p.m. on November 16, 2001. All the doors and windows were locked. Dogs inside the house appeared to have left fecal matter on the carpet, indicating that they had been confined for some time. Holik's realtor and neighbor, Lakki Brown, saw the police officers. She opened the front door for them.

Holik's body was found face down on the floor in an upstairs guest bedroom. The body was fully clothed and there was no evidence of a sexual assault. Holik's neck bore the marks of a ligature, which was never found. Holik's wrist bore indentations showing discernible redness, indicating that her heart was still beating when the wrists were bound. The indentations appeared to have been made by plastic zip ties or flex-cuffs once used by police to bind prisoners' wrists together. No zip ties were found on the body or in the house. When the police officers rolled the body over, a charm fell out of Holik's hair. It was shown at trial that she wore the charm on a necklace. No such necklace was found. No rings were found on the body. Her $17,500 engagement ring was missing. A jewelry box, which contained a substantial amount of jewelry, including some

3

very expensive pieces, was missing from the master bedroom. A spare front door key with a ribbon was missing from the doorknob of a ground floor door.

Dr. Elizabeth Peacock, deputy medical examiner, performed the autopsy and determined the cause of death to be homicide by ligature strangulation. Dr. Peacock estimated that Holik died between 3:00 p.m. on November 15 and 3:00 a.m. on November 16, 2001.

Cynthia Barajas, a coworker from California, testified that she contacted Holik by telephone about 12:30 p.m., Austin time, on November 15, 2001. Holik explained why she was late in calling Barajas and added: "This guy just left." Holik said that she planned to meet with the man and his wife the following Saturday to show her house. Holik was excited because she thought she had sold her home. Barajas warned Holik that she should not let strangers into her home when she was alone. During the conversation Holik panicked when she realized that she did not have her expensive engagement ring on her hand. She put the phone down, but later returned and told Barajas that her rings were "back on." The conversation eventually concluded about 1:30 p.m.

Robert Hebner and his wife were neighbors and friends of Holik. On occasion Hebner's wife took care of Holik's dogs. On November 15, 2001, when Hebner was coming home, he observed a gold or brown van parked in front of Holik's home about 5:00 or 5:15 p.m. The van was parked in such a manner that Hebner thought that a potential buyer was there. He knew that Holik had been trying to sell her home.

During the course of their investigation, the police learned that, on November 15, 2001, some Great Hills residents, who had for sale signs in the front of their houses, had been approached by a man who claimed to be interested in buying their homes. The man told some that

4

he would return with his wife on the weekend to see the house, that he had recently sold a ranch or some property, and that he would be paying cash. The man gave different names to some of the homeowners. At least two homeowners testified that the man came to their houses twice on November 15, 2001, in the Great Hills subdivision. A composite drawing of the man was prepared by an artist with directions from one of the homeowners. A homeowner from another subdivision saw the drawing in the newspaper and called the police. When trying to sell her home, a man, generally fitting the description, came to her home in May 2001 just after her husband left for work. He returned on November 5, 2001, at the same time. On this latter date, she took note of the license plate number on his van. Using this number, the police were able to identify appellant as the man they were seeking.

Appellant worked at the New Life In Christ Church in Bastrop. He was a worship leader and music director. On November 17, 2001, there was a church staff meeting. According to the pastor, Jim Fox, appellant stated that God had gotten his attention during the November 15 storm, and that it was a determining time in his life. Appellant was ready to submit to the authority of the pastor. There had been a power struggle between the two at the church. Appellant appeared broken and downcast when making his statements.

In the early morning hours of November 21, 2001, police officers executed a search warrant at appellant's Bastrop home. Appellant agreed to go with the officers to the Austin police station, telling his wife that the inquiry possibly had something to do with his parole status. He was interviewed during the transport and at the station. Appellant told the detectives that he became lost during the storm in a residential area of Austin. He said that he did not enter any houses. Appellant

5

also said that he stopped at only one house to ask for directions, which he received from an older gray-haired man. He told the officers that he had a Christian rock band called "Broken Silence," and that on the afternoon of November 15, 2001, he had driven to the KNLE radio station in the northwest section of Austin to discuss a Web site. Appellant claimed that he knocked on the front door but no one at the radio station answered. Appellant stated that the storm began and he left. The manager of the KNLE station, Sherland Priest, testified that because of the approaching storm, all employees were in the lobby with the doors open because of expected high winds on the afternoon of November 15, 2001. Appellant was known to the manager because of previous contacts. Priest testified that appellant did not appear at the station on the day and time in question. In his interview with the police, appellant asked them what motive he would have to kill Holik, a woman that he did not know. Appellant was released after 8:00 a.m. on November 21, 2001.

Later the same day, appellant went to the home of his pastor and discussed his conversation with the police. Pastor Fox stated that appellant felt that he was going to be arrested for killing a lady. Appellant said that some jewelry had been taken from the victim. It was later shown that the police did not inform appellant that any jewelry was missing from the Holik home.

Susan Fox, the pastor's wife, testified about the same conversation. According to her, appellant said that during the storm, he stopped at a house to ask directions and "a lady" came to the door, that it was raining hard, and that she was "kind of bothered" about his being there. Susan Fox reported that appellant said that he had shaved off his goatee and had removed the pin-striping from his van, and that these actions might look suspicious to the police.

6

Police officers searched appellant's church office on November 21, 2001. They arrested appellant later that day at his pastor's house, transported him to Austin, and again interviewed him.

A Bastrop area telephone service representative testified about cell phones registered to appellant and his wife. Appellant's cell phone had calls at 3:30 p.m., 5:34 p.m., and 5:56 p.m. on November 15, 2001, and these outgoing calls originated in northwest Austin.

The prosecution called thirteen witnesses who were attempting to sell their homes from May to November 15, 2001, or were realtors. Five of these witnesses were Great Hills residents who were approached at their homes on the day of the murder. Appellant was shown to have visited the homes of Thoom Zech and Lisa Faulkner twice on November 15, 2006, as he may have done at the victim's home. All these witnesses, except Bob Reynolds, were women. Christine Choate, one of the homeowners and also a realtor, testified that appellant came to her Great Hills home on November 15, 2001, between 3:00 and 3:30 p.m. and identified himself as "Walter Miller." Appellant appeared nervous and was sweating. Choate allowed him to see the inside of the house. Appellant told her that he would pay cash, that he had just sold a ranch, and that he needed to buy quickly. He said that he would set up an appointment for his wife to see the house on the weekend. Johna Ramirez, who lived in the Upland subdivision of Austin, identified appellant as the man who came to her house, which was for sale, on May 15 and November 5, 2001, both times just after her husband left for work. He gave the name of Jim Taylor. He was not permitted entry and rejected statements suggesting that he contact his realtor. On the second occasion, Ramirez

7

noted the license plate of the Ford minivan that appellant was driving. This information was given to the police after November 15, 2001.

Many of the homeowner-witnesses were able to identify appellant as the man who came to their homes, wanting to see the house or a floor plan, saying that he would be a cash buyer, having just sold a ranch, rejecting the idea of contacting a realtor, and frequently saying that he would return with his wife on the weekend. Several of the witnesses described a vehicle nearby at the time as similar to the champagne or tan-colored van shown to have been driven by appellant.

Tammy Cranford identified appellant as the man who came to her home at 4505 Tello Path in south Austin about 1:30 p.m. in early November 2001. Cranford had just gotten her children down for a nap. Her nineteen-month-old son was in the master bedroom and her three-month-old daughter was in the nursery. She saw a gold or champagne-colored minivan pull up to the "for sale" sign in the yard. The man took a black-and-white flyer out of the plastic real estate bucket and approached the house. Cranford opened the front door to prevent the bell from awaking the children. The man asked for a floor plan, which Cranford did not have. She described the man as appearing nervous and sweaty. His hands holding the flyer were shaking.

The man, whom Cranford later identified as appellant, noted that Cranford had switched realtors, but the switch had occurred in July 2001. Appellant stated that the house was beautiful and that he was going to be selling a ranch and would be paying cash for a house. Cranford invited him into the house. Appellant placed the black-and-white flyer on a table in the foyer. Cranford put her Great Dane dog in the study. She stated that appellant "breezed through" some areas of the house. He then inquired whether there was a husband or boyfriend with whom he could

8

deal. Cranford told him that her husband was not home often as he was a busy man, but that they had a realtor. At one point, Cranford's son awakened and she moved him to the family room.

Cranford and appellant went to the son's bedroom. She described appellant as opening the closet door and then dropping his arms to his side and just standing there without saying anything. Cranford was close to him. He looked at her and his demeanor seemed to change. He became sweaty and very shaky, and there was a strange look in his eyes. Cranford said that appellant's eyes somehow looked bigger and deeper and darker and that he seemed to be a different person. It was an awkward situation. Cranford left the room and appellant stayed behind.

In the hallway, Cranford became nervous because appellant continued to stand in the bedroom with a distant look on his face. Her daughter awakened and screamed. Cranford went to the nursery to calm the child. Suddenly, appellant was close behind her in the room and still was not speaking. Cranford left and let the dog out of the study because she was uncomfortable.

Appellant then asked several times when Cranford's husband would be home. He then stated that he and his wife could return the next day. Appellant inquired whether the dog would calm down if petted. He began to pet the animal and the dog responded. He asked about the alarm system. Cranford told him that she did not use it during the day. As appellant was leaving, he said his name was "Tony," and he asked to take a colored real estate flyer from the table in the foyer. He left the black-and-white flyer behind. Appellant did not return the next day.

Later, Cranford described the incident to a friend, who subsequently called her and asked her to look at a composite drawing in the newspaper and the accompanying story. Cranford

9

thought the drawing bore a very good resemblance to appellant. The black-and-white flyer was turned over to the police.[3]

Approximately twelve realtors testified that in 2001, a man, whom most of these witnesses identified as appellant, had contacted them about a home or homes he needed to see immediately, and who indicated that he was a cash buyer and could afford houses from $200,000 to $700,000. He insisted that he be shown only vacant houses. In many situations, he wanted to meet the woman realtor alone at the site of the vacant house. Many of realtors were "uncomfortable" while showing homes to the man. Appellant's telephone number was given and identified. The realtors' telephone numbers appeared on appellant's phone bill.

Appellant's wife, Janet, was a school teacher for the Smithville Independent School District. Appellant received approximately $50.00 a week for his work at the church. He was a full-time unskilled employee at a custom-cabinet-making company. Appellant only worked there about thirty hours a week, but appellant voluntarily quit that job.

The prosecution offered evidence of appellant's financial condition during the time period in question. Evidence from representatives of Wells Fargo Financial Company, Austin Area Teachers Federal Credit Union, and Mazda American Credit Company was offered concerning loans or loan applications made by appellant and his wife. Cathy Vance, a forensic analyst with the white collar crime unit in the district attorney's office, analyzed appellant's financial records. Her testimony demonstrated that appellant and his wife had more than $40,000 in available monies in

---

[3] Appellant's known fingerprints matched the prints on the black-and-white flyer and prints on the flyer box in Tammy Cranford's yard.

1999, but that at the time of the offense, they had approximately $1,796.19. The evidence shows that appellant and his wife had a $199,000 mortgage on their trailer home in Bastrop.[4]

There was an extensive crime scene investigation at the victim's home. During the autopsy, police officers collected biological evidence from the victim's left hand. The police officers also recovered a green towel found on a couch downstairs. Brady Mills, the supervising criminalist at the Department of Public Safety (DPS) laboratory in Austin, extracted DNA from a swab of the victim's left hand. He compared the samples with known DNA samples from the victim, the appellant, the victim's fiancé, and a male coworker. The fiancé and coworker were excluded, but Mills could not exclude DNA samples from the victim or appellant on the swab. Appellant's DNA could not be excluded from four of nine loci considered by Mills.

Kimberlyn Nelson of Mitotyping Technologies at State College, Pennsylvania, testified that she specialized in mitochondrial DNA testing. All persons inherit mitochondrial DNA from their mothers—so maternal relatives have the same "M-DNA." Nelson examined seven hairs recovered from the victim's home. Appellant could not be excluded from two hairs retrieved from a green towel found in the living room.[5]

Dr. Ranazit Chakraborty, Director of the Center for Genome Information of the University of Cincinnati College of Medicine, reviewed the findings by Mills and Nelson. He testified that he hypothesized the coincidental chances of obtaining the same nuclear DNA results in

---

[4] There was evidence that appellant's wife inquired about property in Bastrop County. When she learned that the sale price was $270,000, she stated that the price was "way out of their range."

[5] It was the State's theory that when appellant came to or returned to the victim's home on November 15, 2001, it was raining heavily and the towel had been given to him and then left in the living room.

this case would be one in 16,817. When Dr. Chakraborty considered the mitochondrial DNA, he decided that the coincidental chance of obtaining the same profile in this case is one in 12.9 million people.

On June 18, 2003, a search warrant was issued authorizing the search of appellant's home and the seizure of his personal computer "and its content." The computer was seized pursuant to the warrant. Detective Roy Rector, a computer forensic examiner with the Austin Police Department, was initially requested to look for references in the computer to the victim, her address, or her realtor. No such references were found. His search was broadened to consider the Internet history, searching for documents relating to real estate, including Web pages. More than 136 such documents in the temporary Internet files folder or unallocated clusters (deleted files) were located. Several of the Internet pages related to the realtors who testified at trial.

Rector presented the information extracted from the computer to the prosecutor, who noticed that the computer's Internet history (which contained no Web pages or images) made reference to a Web site named "necrobabes.com," which was later determined to be an asphyxiation-type pornographic Web site.

On November 18, 2003, a second search warrant was issued, that authorized the search of the hard drive of appellant's computer for "[i]nformation pertaining to death by asphyxiation" as well as other information and photos and text from the Web site named "necrobabes.com."

Joseph Schwaleberg, the record custodian of Generic Systems, a billing company that controlled access to the "necrobabes.com" Web site, testified that a "Tony Russo" with the same

12

home and e-mail address as appellant purchased a six-month membership on July 21, 2001. An earlier membership had been issued on February 28, 2001, to a "Janet Russo" at the same address. Passwords were issued allowing entry to the said Web site as a result of the memberships. Rector recovered two hours, thirty-six minutes, and fifty-five seconds of Internet history of the "necrobabes.com" Web site. The Web site was accessed or visited by appellant's computer in the month prior to the victim's murder, including on November 13, 2001, two days before the offense ocurred. The Web pages viewed by appellant included manual and ligature strangulation. Some 1,200 "necrobabes.com" related images were recovered.[6]

Dr. Richard Coons, a psychiatrist and an attorney, testified concerning his training in human sexuality. He qualified as an expert witness for the State. Dr. Coons viewed the images shown to have been accessed by appellant on his computer from the "necrobabes.com" Web site as well as photographs of the victim's body. Dr. Coons was presented with a hypothetical scenario based on the evidence admitted at trial (except evidence of robbery). He indicated that the material from the erotic asphyxiation Web site tended to reveal the motive for the killing of the victim, which was sexual sadism. Dr. Coons explained that a sexual sadist is sexually stimulated with a fantasy life and becomes obsessive. The person will "play out" the fantasies, searching out potential victims. The person is aroused by watching and controlling another with knives or guns or injuring them by other methods, including ligature strangulation. In many such encounters, Dr. Coons explained,

---

[6] Evidence was admitted that demonstrated that appellant's wife (a school teacher) and his son (a student) were at school during much of the time that the Internet was used to access the "necrobabes.com" Web site. Appellant's son, Anthony Russo, testified that he had access to the computer, but never used his parents' credit card to purchase anything on the computer and never viewed images on the computer of people being killed.

there is no completed sexual act. The underlying purpose can be killing, dominating, or humiliating another. The doctor testified that in his opinion, the hypothetical scenario strongly suggests that the defendant in the scenario sought sexual gratification through ligature strangulation.

After the State rested its case-in-chief at the guilt/innocence stage of the trial, appellant's motion for an instructed verdict of "not guilty" was overruled. The defense closed with the State at this stage of the trial without offering evidence.

## LEGAL SUFFICIENCY

In his first point of error, appellant challenges the legal sufficiency of the evidence "to establish [that] appellant committed murder in the course of robbery."

## DUE PROCESS AND STANDARD OF REVIEW

The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires every state criminal conviction to be supported by evidence that a rational trier of fact could accept as sufficient to prove all the elements of the offense charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *Fisher v. State*, 851 S.W.2d 298, 302 (Tex. Crim. App. 1993); *see also* Tex. Penal Code Ann. § 2.01 (West 2003); *Ward v. State*, 143 S.W.3d 271, 274 (Tex. App.—Waco 2004, pet. ref'd). Under the Fourteenth Amendment, the task of the appellate court is to consider all the evidence in the light most favorable to the verdict and determine if any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003); *Cardenas v. State*, 30 S.W.3d 384, 389-90

14

(Tex. Crim. App. 2000). Reviewing courts are not fact finders. Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). "If, based on all the evidence, a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal." *Fisher*, 851 S.W.2d at 302 (quoting *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992)); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). The legal sufficiency of the evidence under the *Jackso*n standard is a question of law. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991); *Roberson v. State*, 16 S.W.3d 156, 165 (Tex. App.—Austin 2000, pet. ref'd).

In assaying all the evidence under the *Jackson* standard of review, a reviewing court must consider all evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The standard of review is the same for both direct and circumstantial evidence. *Guevara*, 152 S.W.3d at 49. The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987); *Roberson*, 16 S.W.3d at 164. In analyzing a challenge to the legal sufficiency of the evidence, a reviewing court does not realign, disregard, or weigh the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000); *Rodriguez v. State*, 939 S.W.2d 211, 218

(Tex. App.—Austin 1997, no pet.). The jury as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given the testimony and may accept or reject all or any of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson*, 819 S.W.2d at 846; *Ware v. State*, 62 S.W.3d 344, 349 (Tex. App.—Fort Worth 2001, pet. ref'd).

In capital murder offenses committed during the course of a robbery, *see* Tex. Penal Code Ann. § 19.03(a)(2), the legal and factual sufficiency standards apply to both the charged and underlying offenses. *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995); *Brewer v. State*, 126 S.W.3d 295, 297 (Tex. App.—Beaumont 2004, pet. ref'd). To establish the murder portion of the charged offense, the State must prove beyond a reasonable doubt that the defendant intentionally or knowingly caused the death of an individual as charged in the indictment. Tex. Penal Code Ann. § 19.02(a) (West 2003); *Rey v. State*, 897 S.W.2d 333, 340 n.7 (Tex. Crim. App. 1995); *Brewer*, 126 S.W.3d at 297.

To establish capital murder committed during the course of a robbery, the prosecution must prove beyond a reasonable doubt, in addition to the alleged murder, that the defendant possessed the specific intent to obtain or maintain control of the victim's property either before or during the commission of the offense. *Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999). Proof of a completed theft is not required. *Bustamante v. State*, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003); *Maldonado*, 998 S.W.2d at 243.

16

In the instant case, appellant challenges only the legal sufficiency of the evidence to establish the underlying offense of robbery. He does not challenge the evidence supporting the commission of the murder. Appellant does not brief or present argument or authority in support of any contention that the allegations of murder are not supported by the evidence. Any such contention is inadequately briefed. *See* Tex. R. App. P. 38.1; *Hankins v. State*, 132 S.W.3d 380, 385 (Tex. Crim. App. 2004). We will not make appellant's argument for him on an issue that he has not chosen to present. *Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000). The State has interpreted appellant's contention likewise and has briefed only the sufficiency of the evidence relating to the aggravating element of the capital murder.

We shall consider the issue presented. For murder to qualify as capital murder in the course of a robbery, the killer's intent to rob must be formed before or at the time of the murder. *Conner*, 67 S.W.3d at 197; *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). Proof of robbery committed as an afterthought and unrelated to the murder is not sufficient evidence of capital murder. *Alvarado*, 912 S.W.2d at 207. If there is evidence, however, from which the jury could rationally conclude beyond a reasonable doubt that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State has proved that the murder occurred in the course of the robbery. *Conner*, 67 S.W.3d at 197; *Alvarado*, 912 S.W.2d at 207; *Robertson v. State*, 871 S.W.2d 701, 706 (Tex. Crim. App. 1993); *Key v. State*, 151 S.W.3d 618, 621 (Tex. App.—Beaumont 2004, pet. ref'd). This is true even where the element of appropriation occurred after the murder. *Zimmerman v. State*, 860 S.W.2d 89, 93 (Tex. Crim. App. 1993).

17

In *Hall v. State*, 970 S.W.2d 137, 141 (Tex. App.—Amarillo 1998, pet. ref'd), the court held that proof of murder coupled with evidence of a contemporaneous theft from the victim is enough to enable a jury to rationally conclude beyond a reasonable doubt that the murder occurred during the course of a robbery and that the accused had the intent to rob at the time of the murder.

In *Cooper v. State*, 67 S.W.3d 221 (Tex. Crim. App. 2002), an aggravated robbery case, the Court held that the general rule is the theft or attempted theft occurring immediately after an assault will support an inference that the assault was intended to facilitate the theft for the purposes of proving robbery. *Id*. at 224. This inference is not negated by evidence of an alternative motive that a jury could rationally disregard. *Id*. We conclude that the general rule stated in *Cooper* is applicable capital murder cases where the offense was committed in the course of a robbery.[7]

Intent may be inferred from the acts, words, and conduct of the accused. *See Guevara*, 152 S.W.3d at 50; *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Dues v. State*, 634 S.W.2d 302, 305 (Tex. Crim. App. 1982). Mental culpability is of such a nature that it generally must be inferred from the circumstances under which the prohibited act occurred. *See Dillion v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978); *Skillern v. State*, 890 S.W.2d 849, 880 (Tex. App.—Austin 1994, pet. ref'd). Thus, the jury may infer the requisite intent to rob from the conduct of the accused. *Conner*, 67 S.W.3d at 197.

---

[7] In *Cooper v. State*, 67 S.W.3d 221 (Tex. Crim. App. 2002), the Court in reaching its decision revisited its earlier opinion in *Nelson v. State*, 848 S.W.2d 126 (Tex. Crim. App. 1992), and *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989), and reconciled these holdings. These are the same cases that the Amarillo Court of Appeals analyzed in *Hall v. State*, 970 S.W. 137, 141 ((Tex. App.—Amarillo 1998, pet. ref'd). *See also Huffman v. State*, 746 S.W.2d 212, 217 (Tex. Crim. App. 1988); *Whitaker v. State*, 977 S.W.2d 869, 872-873 (Tex. App.—Beaumont 1998, pet. ref'd); *Schexnider v. State*, 943 S.W.2d 194, 198-99 (Tex. App.—Beaumont 1997, no pet.).

18

The State may prove its entire case by circumstantial evidence alone if it proves all the elements of the charged offense beyond a reasonable doubt. *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd). Keeping in mind that appellant does not challenge the legal sufficiency of the evidence to support the murder portion of the charged offense, we examine the challenged portion.

Diane Holik was murdered, in her own home where she lived alone, by strangulation with a ligature, and her body was left in a locked house. Her valuable engagement ring was in her possession at 1:30 p.m. on November 15, 2001. This ring, and a necklace she routinely wore, a brown box containing expensive pieces of jewelry, and a spare house key were determined to be missing. The time frame of her death was placed by the medical examiner from 3:00 p.m. on November 15 to 3:00 a.m. on November 16, 2001. The evidence indicates that Holik's dogs had been confined in the house for some time.

Appellant's DNA was found on Holik's left hand, where engagement rings are worn. Appellant's DNA was also found on Holik's green bath towel that was discovered in the living room. There was evidence indicating that appellant had been to the Holik house twice on November 15, 2001, as he had been to other homes for sale in the Great Hills subdivision on November 15, 2001. Holik had plans to meet on the weekend with a man who was leaving her house when she talked to Barajas on the telephone. This is the same story appellant was shown to be consistently telling other homeowners about returning on the weekend with his wife to look at the house. Moreover, about 5:00 p.m. on the afternoon of November 15, 2001, a van fitting the description of appellant's minivan was seen parked in front of Holik's house.

19

Other evidence showed that several days before the murder, appellant accessed the "necrobabes.com" Web site which detailed a scenario that involved the ligature strangulation of a woman and the theft of her jewelry.

After having been first interviewed by Austin police officers, appellant discussed the matter with Pastor Fox, telling Fox that "some jewelry was stolen" in the offense, but the police had not communicated that information to appellant. Appellant lied to the police when he denied being at Holik's house or in the Great Hills subdivision and asserted that he had gone to a radio station.

Moreover, there was evidence that at the time of the murder, appellant was in dire financial straits. The prosecution is not required to prove motive in any case. It is not an element of any crime, but evidence of motive is generally admissible because it is relevant as a circumstance tending to prove guilt. *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982); *Eby v. State*, 165 S.W.3d 723, 737 (Tex. App.—San Antonio 2000, pet. ref'd); *Miranda v. State*, 813 S.W.2d 724, 733, 742 (Tex. App.—San Antonio 1991, pet. ref'd); 1 Steven Goode, Olin Guy Wellborn, III & M. Michael Sharlot, *Texas Practice: Guide to the Texas Rules of Evidence* § 401.3 (2d ed. 2002).

Appellant argues that there were no eyewitnesses to the offense. And, with the engagement ring aside, appellant questions the credibility of the testimony concerning the other missing jewelry. He claims that the fact that Holik's undisturbed purse was found in her car in the garage dispels any notion of a robbery at the scene. Appellant cites no authority to support his contentions.

Appellant asserts that none of the missing property was found in his possession or ever recovered, despite searches of his home and church office, the use of metal detectors in his yard,

20

and a survey of pawn shops. There is, however, no legal requirement that property stolen must be recovered in whole or in part to constitute the offense of robbery. *See Chaney v. State*, 474 S.W.2d 711, 712 (Tex. Crim. App. 1972); *Dean v. State*, 154 S.W.2d 459 (Tex. Crim. App. 1941). Proof of a completed theft is not even required. *Maldonado*, 998 S.W.2d at 243.

Appellant notes that the response of Dr. Richard Coons to a hypothetical question based roughly on the facts of the case did not mention robbery. This is true, but the hypothetical scenario propounded by the State to Dr. Coons did not include any reference to robbery. Dr. Coons's expert opinion was that the facts given to him showed a motive of "sexual gratification through ligature strangulation." Such motive is not inconsistent with evidence of intent to commit robbery during the same incident where the intent to rob is timely formed. *See Conner*, 67 S.W.3d at 167. Appellant relies upon *Brewer v. State*, 126 S.W.3d 295 (Tex. App.—Beaumont 2004, no pet.), to support his argument. *Brewer* is factually distinguishable from the instant case. The *Brewer* court pointed out that there was no evidence to show that a theft or a robbery of the victim took place or that the defendant was implicated in the offense. Thus, there was no probative evidence of an intent to rob. *Brewer* is not applicable in light of the facts here.

In a legal sufficiency review of the evidence, the jury's inference of intent is afforded greater deference than evidence supporting proof of conduct. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Circumstantial evidence of intent is not required to meet the same rigorous criteria for legal sufficiency as circumstantial proof of other offensive elements. *Id.; Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995).

We conclude from all the evidence that a rational jury could have found beyond a reasonable doubt all the essential elements of capital murder, including the aggravating element of robbery involving the timely formed intent to steal. The first point of error is overruled.

## MURDER IN THE COURSE OF KIDNAPPING

We do not reach the second point of error claiming legal insufficiency of the evidence to establish that the murder occurred in the course of a kidnapping. The trial court submitted to the jury both theories of capital murder alleged in the indictment, that the murder occurred in the course of (1) a robbery or (2) a kidnapping. The jury returned a general verdict of guilty of "capital murder." Where different theories of the offense are submitted to the jury in the disjunctive, as in the instant case, a general verdict is sufficient if the evidence supports one of the theories. *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002); *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Rabanni v. State*, 847 S.W.2d 555, 558-59 (Tex. Crim. App. 1992); *Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991). As the evidence is legally sufficient to support the theory of murder committed in the course of robbery, we need not address the second point of error.

## FACTUAL SUFFICIENCY — MURDER IN THE COURSE OF ROBBERY

In the third point of error, appellant challenges the factual sufficiency of the evidence to establish that appellant committed murder in the course of robbery. Here again, appellant does not contest the evidence supporting the murder conviction but claims only that the evidence is factually insufficient to show that the offense occurred in the course of a robbery.

22

When both the legal and factual sufficiency of the evidence are challenged, the reviewing court must first review the evidence under the legal sufficiency standard. *Harmond v. State*, 960 S.W.2d 404, 406 (Tex. App.—Houston [1st Dist.] 1998, no. pet.). This is true because a review of the factual sufficiency of the evidence begins with the presumption that the evidence supporting the judgment of conviction is legally sufficient. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In such an analysis, we view all the evidence in a neutral light. *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); *Clewis*, 922 S.W.2d at 134. All the evidence must be considered, whether rightly or wrongly admitted. *See Camarillo v. State*, 82 S.W.3d 529, 537 (Tex. App.—Austin 2002, no. pet.). One of the principles of a factual sufficiency analysis is deference to the findings of the jury. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). We must remain cognizant of the fact-finder's role. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). A reviewing court may, however, disagree with the result to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9. There are two ways in which a court may find the evidence to be factually insufficient: if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, *or* if the verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (reclarifying *Clewis* and overruling *Zuniga v. State*, 144 S.W.3d 477 (Tex. Crim. App. 2004), to the extent of any conflict); *see also Marshall v. State*, 210 S.W.3d 618, 626 (Tex. Crim. App. 2006).

In making his factual sufficiency argument, appellant continues to argue that there was insufficient evidence to establish robbery during the course of a murder. We need not reiterate the evidence. The jury is the sole judge of the facts, the credibility of the witnesses, and the weight

to be given the evidence. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). The jury may accept or reject all or any part of any witness's testimony, *James v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998), and resolve any conflicts in the evidence. *Heiserbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). We conclude that the evidence supporting the finding of guilt is not so weak as to make the finding clearly wrong or manifestly unjust, nor is the verdict against the great weight and preponderance of evidence. *See Watson*, 204 S.W.3d at 414-15. We overrule the third point of error.

## FACTUAL SUFFICIENCY — KIDNAPPING

For the same reason we did not reach the second point of error, we do not reach the fourth point claiming factual insufficiency to show murder in the course of a kidnapping.

## EXTRANEOUS CONDUCT EVIDENCE

In his fifth point of error, appellant urges that "[t]he trial judge erred in the admission of extraneous conduct evidence from other[8] homeowners and realtors under Tex. R. Crim. Evid. 401 & 403."[9]

The point of error is multifarious and is not easy to decipher. Although appellant used the phrase "extraneous conduct evidence" in the point of error, there was no objection on the

---

[8] Although it is not clear, it appears that appellant is limiting his point of error to certain witnesses apart from all homeowners and realtors whose testimony was not objectable or to which there was no objection.

[9] The Texas Rules of Criminal Evidence was superseded by the Texas Rules of Evidence effective March 1, 1998. *See* order of the Texas Court of Criminal Appeals dated February 25, 1998, entitled "Final Approval of Revisions To The Texas Rules of Evidence in Criminal Cases."

basis of Rule 404(b).  Tex. R. Evid. 404(b).[10]  No error was preserved on this basis.  *See Santellan*,

939 S.W.3d at 168; *Harrell v. State*, 884 S.W.2d 154, 161 n.14 (Tex. Crim. App. 1994).  Appellant

relies on Rule 401[11] to claim that the testimony of seven of the female homeowners and realtors

concerning their encounters or interactions with appellant was too remote to be relevant.  In the other

portion of the point of error, appellant complains of the testimony of thirteen female homeowners

---

[10]  Rule 404(b) provides:

(b) **Other Crimes, Wrongs or Acts**.  Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404(b).

[11]  Rule 401 provides:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence.

Tex. R. Evid. 401.

Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority.  Evidence which is not relevant is inadmissable.

Tex. R. Evid. 402.

and realtors, relying upon Rule 403. Tex. R. Evid. 403.[12] He does not advance a claim that his extraneous conduct with these latter witnesses was inadmissible, but only that only certain parts of their testimony about their own "emotions, feelings, or actions" during or after their interactions with appellant were inadmissible because their probative value was substantially outweighed by the danger of unfair prejudice. Here we are presented with the separate testimony of thirteen witnesses whose different phrases or words are lifted out of the context of their individual testimony and claimed to be inadmissible under Rule 403.

There were no trial objections to the subject matters advanced in this point of error. *See* Tex. R. App. P. 33.1. If error was preserved, it was during pretrial hearings. During a pretrial hearing on August 18 and 19, 2003, seventeen female homeowners and realtors testified by agreement of the parties with the approval of the trial court, apparently hoping to save time later at the trial on the merits. There were no statutory pretrial motions involved. *See* Tex. Code Crim. Proc. Ann. art. 28.01 (West 2006). At the hearing, no objections were addressed to the testimony offered. *See* Tex. R. App. P. 33.1.

At the conclusion of the hearing, appellant was permitted to wait and view the completed transcription of the court reporter's record of the hearing and then make objections. On

---

[12] Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Tex. R. Evid. 403.

26

October 20, 2003, appellant filed written objections to the remoteness of the testimony of certain designated witnesses citing, Texas Rules of Evidence 401 and 402. He also objected to excerpts from the testimony of certain other witnesses under Rule 403. Tex. R. Evid. 403. There were no objections based on Rule 404(b) included in the written objections. Tex. R. Evid. 404(b).

On October 29, 2003, during a separate pretrial hearing, the written objections were mentioned. The State offered and did eliminate certain parts of the testimony of Melody Blount and Tammy Tayman. Appellant's counsel made general remarks and argued that, after learning of the homicide, many of the witnesses overreacted in describing their encounters or interactions with appellant. If this was an objection, it was not included in the written objections. There had been no interrogation along these lines. The trial court had not read the written objections and deferred any ruling at that time.

On November 25, 2003, at still another separate pretrial hearing, the trial court paused and overruled appellant's Rules 401 and 402 objections to certain testimony. The trial court found that the evidence of seven witnesses was not too remote and was relevant. The trial court specifically overruled the Rule 403 objections to other witnesses but deferred any ruling on the witness Paige Quinluin until trial.[13] It appears that the trial court also overruled the later objection that certain witnesses overreacted in describing their encounters with appellant.

If appellant preserved error for review, it is based on these pretrial rulings under the unique circumstances described. Appellant did not further object at trial. As noted, appellant cannot

---

[13] We have not found or been directed to any trial ruling on Paige Quinluin's testimony. It does not appear that appellant obtained an adverse ruling necessary to preserve error, if any. *See* Tex. R. App. P. 33.1(a).

rely upon Rule 404(b) because he made no objection on that basis either at trial or at the pretrial hearings. We observe that a general relevancy objection, even though timely, does not preserve an extraneous offense claim under Rule 404(b). *Medina v. State*, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999). Appellant's relevancy objections were specifically directed only to the question of remoteness concerning appellant's encounters with certain female homeowners and realtors. He makes no claim that the evidence was inadmissible because it revealed extrinsic acts or misconduct.

Appellant's remoteness argument is broad based. His complaint about the testimony provided by Melody Blount, Annette Beeler, Connie Morton, Stephanie Nichols, Kathleen Hamlet, Sandy Menley, and Johna Ramirez is based on contact with appellant alleged to have occurred in May 2001. He further complains that the testimony provided by Tammy Tayman and Holly Dittart are based on contact with appellant, alleged to have occurred in August 2001. Appellant simply asserts that because the encounters occurred either six months or three months before the offense on November 15, 2001, the evidence is too remote to be relevant and should not have been admitted.

Appellant cites *Bachofer v. State*, 633 S.W.2d 869 (Tex. Crim. App. 1982), for the proposition that extraneous offenses that are otherwise relevant are not too remote if they occurred within one year of the charged offense. Appellant seeks to distinguish *Bachofer* on the basis that the instant case did not include any criminal act by appellant during the encounters.

Questions, as here, of when testimony becomes too remote and, therefore, irrelevant are left to the sole discretion of the trial court. *Nethery v. State*, 692 S.W.2d 686, 706 (Tex. Crim. App. 1985); *Stilwell v. State*, 434 S.W.2d 861, 863 (Tex. Crim. App. 1968); *Thompson*

28

*v. State*, 59 S.W.3d 802, 808 (Tex. App.—Texarkana 2001, pet. ref'd). There is no per se rule by which to determine when evidence is too remote to be admissible. *Templin v. State*, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986). Proximity in time and place may be a factor, but it must be considered along with other facts and circumstances. *Lang v. State*, 698 S.W.2d 735, 736 (Tex. App.—El Paso 1985, no. pet.). *McDonald v. State*, 513 S.W.3d 44, 51-52 (Tex. Crim. App. 1974), held that relevant evidence involving an extraneous offense one year earlier was not too remote. *See also Robinson v. State*, 701 S.W.2d 895, 898 (Tex. Crim. App. 1985) (six months is not too remote). Moreover, objections based on remoteness go to the weight rather than the admissibility of the evidence. *Nethery*, 692 S.W.2d at 706; *Thompson*, 59 S.W.3d at 808.

We need not recite all the facts and circumstances demonstrating the lack of remoteness. If error was properly preserved, we conclude that the trial court did not abuse its discretion in admitting the complained-of evidence in light of the objections made. The first part of the fifth point of error is overruled.

In the other part of this point of error, appellant claims that the trial court erred in its pretrial ruling concerning the admissibility of certain testimony of each of thirteen witnesses under Rule 403. In his written pretrial objections, appellant did not address the witnesses' testimony about their encounters with appellant or his conduct, but orally urged that their individual testimony about their various "emotions, feelings, or actions" during or after the encounters, even if relevant, were inadmissible because the probative value was substantially outweighed by the danger of unfair prejudice. Appellant calls attention to certain words and phrases lifted out of context in the individual testimony. Some witnesses testified that they were "nervous" or "uncomfortable" during

29

and after the encounters and testified about remaining on a cell phone, staying away from appellant, staying at the front door, going to a place where they could be heard if they screamed, or calling the police or family members after the encounter. Appellant argued that "[s]uch evidence can only prejudice the defendant and distract the jury from the material issues of fact before them."

The thrust of Rule 403 is to favor the admissibility of evidence, *Goodwin v. State*, 799 S.W.2d 719, 738-39 (Tex. Crim. App. 1990), and there is a presumption of the admissibility of the evidence. *Montgomery*, 810 S.W.2d at 389; *DeLeon v. State*, 77 S.W.3d 300, 315 (Tex. App.—Austin 2001, pet. ref'd). So long as the trial court operates within the boundaries of its discretion, there is no abuse of discretion and its decision will not be disturbed on appeal. *McFarland v. State*, 845 S.W.2d 824, 837 (Tex. Crim. App. 1992). If the appellate record reveals criteria reasonably conducive to a risk that the probative value of the tendered evidence is substantially outweighed by unfair prejudice, then the trial court acted irrationally in admitting the evidence and abused its discretion. *Rachal v. State*, 917 S.W.2d 799, 808 (Tex. Crim. App. 1996); *DeLeon*, 77 S.W.3d at 315-16.

In evaluating the trial court's determination under Rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion," recognizing that the court below is in a superior position to gauge the impact of the relevant evidence. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 389).

The evidence of actions taken by the female witnesses while interacting with appellant (taking precautionary measures, staying away from appellant, checking on a child, or calling family, friends or police) or their expressions of concern provided significant background

30

information about the circumstances under which the events occurred.  Events do not occur in a vacuum.  Appellant has not identified any reason why a danger of unfair prejudice exists in relation to the various testimony of the thirteen female homeowners and realtors of which he complains.  At trial, appellant asserted that the witnesses, after learning of the homicide, overreacted in their trial descriptions of their encounters with appellant.  However, there was no interrogation to establish these facts.

The proponent of evidence usually has the original burden of showing that it is relevant and admissible.  *Rankin*, 974 S.W.2d at 718.  "Rule 403 more strongly favors admissibility than did many of the earlier formulations of the appropriate balancing test, with the opponent of the evidence bearing the burden of showing that the probative value is 'substantially outweighed' by countervailing factors."  1 Steven Goode, Olin Guy Wellborn, III & M. Michael Sharlot, *Texas Practice: Guide to the Rules of Evidence*, § 403.1 (3d ed. 2002) (citing *Yohey v. State*, 801 S.W.2d 232, 236 (Tex. App.—San Antonio 1990, pet. ref'd), *Torres v. State*, 794 S.W.2d 596, 599-600 (Tex. App.—Austin 1990, no pet.)).

Under all the circumstances, if error was properly preserved and presented, we conclude that the trial court did not abuse its discretion in overruling appellant's pretrial Rule 403 objections.  The second portion of the fifth point of error is overruled.[14]

---

[14]  In this point of error, appellant does not claim that he was not identified, by direct or circumstantial evidence, as the individual involved in the encounters with the female homeowners or realtors.

31

## THE COMPUTER SEARCH

In his sixth point of error, appellant contends that "[t]he trial judge erred in failing to suppress evidence from the illegal search and seizure of the contents of appellant's computer." The point of error is broadly stated and based only on a claimed violation of the Fourth Amendment to the United States Constitution.

Appellant does not complain of the admission of all the evidence taken from his computer. Further, he does not challenge the probable cause underlying the search warrant issued June 18, 2003, and under which the computer was seized. He urges that the execution of the search of the computer's contents exceeded its scope with the search of a computer file relating to "necrobabes.com." It is argued that the search should have been limited to the computer's contents involving real estate as authorized by the search warrant of June 18, 2003.

Another search warrant was issued on November 18, 2003, expressly authorizing the search of the "necrobabes.com" computer file. It does not appear that appellant challenges the validity of this warrant or its execution. The State contends that the evidence shows that the computer file in question was not itself searched until after the issuance of the search warrant on November 18, 2003.

The essence of appellant's complaint is that the police exceeded the scope of the search under the June 18 warrant when the police "used" information that they learned from the computer's Internet history to "discover private information on appellant's computer." On appeal, appellant simply states: "[A]ppellant's objections and argument are located at R. Vol. 9, 4-5, 75,

81 [pretrial]; R. Vol. 37, 205."[15]  Detective Roy Rector, a forensic computer examiner with the Austin Police Department, first made a copy of the computer's hard drive, which is protocol for forensic computer examination.  Rector examined the computer with a program called "Encase," which is designed to recover any data located on a hard drive, whether it is an active computer file or a previously deleted file.  Rector then performed some keyword searches on the hard drive copy using "Diane Holik," "Pathfinder," and "Lakki Brown" (Holik's realtor).  There were no positive hits on these terms.  Rector was then requested by a prosecutor to conduct a more thorough search to look for Internet activity related to real estate.

Rector explained that the only way to do that was to recover the *entire* Internet history and "go through that basically by hand, look at it to see what is real estate and what is not." Detective Rector reviewed the temporary Internet files and the "index.dat" files to determine the computer's Internet history.  The "index.dat" files reflect the computer's Internet history but do not contain any Web pages and images.  Using "realtor," Rector made a keyword search and found 19 hits in the temporary Internet files and 107 hits in the "unallocated clusters."[16]  On August 1, 2003, Rector presented the extracted Internet history to a prosecutor to "see what is real estate and what is not." The prosecutor noted that the Internet history made reference to a "necrobabes.com." Rector

---

[15]  Appellant's record references are to a pretrial hearing and to a point at the trial on the merits where the trial court overruled the scope of the search objection.  At the pretrial hearing, appellant's trial counsel told the trial court that he first wanted to hear the testimony of Detective Roy Rector, the forensic computer expert, and then tailor his motion to suppress accordingly.  We find no such motion or pretrial ruling thereon.  The trial court did not rule on the matter until trial.

[16]  According to Detective Rector's testimony, the unallocated clusters at some point were resident in the computer but had been deleted.  If the computer erases the index, "the file is still out there in the unallocated clusters until the computer reuses that space."

did not know what that Web site was. While the title appeared suspiciously suggestive and implicitly of a sexual nature, it did not appear to be criminal or of an incriminating character in and of itself. The prosecutor requested Rector to determine if there was additional information of that type on the Internet history concerning "necrobabes.com." Rector was to continue his search for matters relating to real estate and the sale of homes in the Austin area.

At some point, Rector was able to parse the Internet history relating to "necrobabes.com" and determine the dates and times on which the computer had accessed the "necrobabes.com" Web site on the Internet. Several accesses were on November 13, 2001, two days before the Holik murder.

Detective Rector then, on a personal or lab computer, went online to the Web site for "necrobabes.com" which was available without charge to anyone surfing the Internet. He was able to view for free the introductory screens, photographs, and stories pertaining to the death of women by strangulation. He was able to view information about the payment of fees and the purchase of a membership on the Web site. Rector was able to download these introductory screens, and these exhibits were admitted into evidence.

The record reflects that the police were able to learn from Joe Schwaleberg of Generic Systems, Inc., who operated the "necrobabes.com" Web site, that on February 28, 2001, Janet Russo paid for a six-month subscription to this erotic asphyxiation Web site, and that on July 21, 2001, Tony Russo paid for a six-month subscription to the same Web site. Each membership was paid with a credit card traced to appellant. The e-mail and home addresses on the membership records matched appellant's. With Schwalebert's permission, Detective Rector, on a lab computer, went on

34

the Internet to the paid portion of "necrobabes.com" and downloaded all the photographs and stories that appellant had viewed on the Web site, as reflected by the Internet history of his computer. Some of these exhibits were introduced into evidence.

As noted, on November 18, 2003, another search warrant was issued by a district judge to search the hard drive of appellant's computer for, *inter alia*, information, photos, and text from a Web site named "necrobabes.com" and information pertaining to death by asphyxiation. The warrant was executed.

The State urges that the temporary Internet files relating to "necrobabes.com" were not opened before the issuance of the search warrant on November 18, 2003. While the police turned to independent sources to determine the nature of "necrobabes.com," the State argues that the search of the computer for home sales in the Austin area—the object of the June 18th search warrant— continued as evidenced by exhibits later introduced into evidence without objection. That search was not abandoned in favor of an investigation into "necrobabes.com."

The facts do not show that Detective Rector exceeded the scope of the search warrant of June 18 in violation of the Fourth Amendment. In properly construing the entire Internet history, Rector *observed* references to "necrobabes.com." The plain view doctrine applies only to seizures, not searches. The file in question was not seized or opened. Rector made an independent investigation. The resulting exhibits were obtained from an independent source without any tinge of illegality[17] and were admissible into evidence. *See Murray v. United States*, 487 U.S. 533, 541-44

---

[17] The name "necrobabes.com" was indirectly obtained from the computer search pursuant to the search warrant of June 18th, but that was a legal search and did not taint the acquisition of the name.

(1988); *Croshy v. State*, 750 S.W.2d 768, 780 (Tex Crim. App. 1989). Moreover, "there is no Fourth Amendment protection against the disclosure of subscriber information by Internet service providers." Thomas K. Clancy, *The Fourth Amendment Aspects of Computer Searches and Seizures: A Perspective and a Primer*. 75 Miss. L.J. 193, 226 n.100 (Fall 2005) (citing in the following order: *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001) (noting that "computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person—the system operator"); *United States v. Cox*, 190 F. Supp. 2d 330, 332 (N.D.N.Y. 2002) (holding that there is no reasonable expectation of privacy in subscriber information provided to Internet service provider); *United States v. Kennedy*, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000) (no reasonable expectation of privacy in subscriber information); *United States v. Hambrick*, 55 F. Supp. 2d 504, 507-09 (W.D. Va. 1999) (individual has no reasonable expectation of privacy in his name, address, social security number, credit card number, screen name, and proof of Internet connection obtained from Internet service provider); *State v. Evers*, 815 A.2d 432, 440-41 (N.J. 2003) (person had no standing to challenge warrant that obtained his subscriber information from Internet service provider); *Hause v. Commonwealth*, 83 S.W.3d 1, 10-12 (Ky. App. 2001) (no standing for subscriber to challenge warrant that obtained his name, address, and screen name from Internet service provider); *United States v. Ohnesorge*, 60 M.J. 946, 949-50 (U.S. Navy-Marine Ct. Crim. App. 2005) (no reasonable expectation of privacy in subscriber information given to Internet service provider)).

Appellant relies chiefly upon *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), perhaps the preeminent case on computer searches at the time of the trial. The reliance is misplaced.

36

*Carey* is factually distinguishable. The defendant in *Carey* was arrested for the sale of drugs and consented to the seizure of his computer system. *Id*. at 1270. Before conducting any examination of the computers, the police obtained a search warrant to "search the files on the computers for names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to sale and distribution of controlled substances." *Id*. (internal quotation marks omitted). After a keyword search of certain terms proved negative, *Id*. at 1271, the detective began to browse through the file directories in Carey's computer and stumbled across a JPG file[18] and opened it. The file contained an image of child pornography. After the initial discovery, and without obtaining a new warrant, the detective "abandoned" the search for drug trafficking evidence, and proceeded instead to download and view over 200 similarly labeled JPG files in a successful search for further images of child pornography. *Id*. The Tenth Circuit held that while the first image of child pornography was discovered inadvertently and was not subject to suppression because of the plain view doctrine relating to seizures, the detective exceeded the scope of the search warrant by searching for additional pornographic images. This was so because after the accidental discovery of the illegal pornography in the first JPG file, the detective opened subsequent JPG files expecting to find child pornography and not material related to drugs. *Id*. at 1273. As a result, the court concluded that the detective had temporarily abandoned his search for drug trafficking evidence and

---

[18] JPG, also known as JPEG files, contain images. *United States v. Carey*, 172 F.3d 1268, 1271 (10th Cir. 1999).

intentionally commenced a search for more child pornography not authorized by the object of the existing warrant. *Id*.[19]

In connection with appellant's argument, we examine other cases. *United States v. Gray*, 78 F. Supp. 2d 524 (E.D. Va. 1999), involved the federal offenses of unlawfully accessing (hacking) a computer of the National Library of Medicine (NLM) and possession of child pornography. FBI agents executed a search warrant on the defendant's home and seized four computers in connection with an investigation of unauthorized computer intrusions. A special agent, while transferring computer files to CD-ROMS to facilitate the case agent's subsequent search, came across a directory labeled "tiny teen" which contained JPG files. The special agent opened one of these files while systematically searching for NLM documents but wondered if the file might contain

_____

[19] The facts of *Carey* are not the facts of the instant case. The Tenth Circuit clarified and expanded its *Carey* decision in *United States v. Campos*, 221 F.3d 1143 (10th Cir. 2000), and *United States v. Walser*, 275 F.3d 981 (10th Cir. 2001). In *Campos*, the officers learned that the defendant had transmitted two images of child pornography from his computer. The officers obtained a search warrant to search the defendant's hard drive for any images of child pornography. 221 F.3d at 1147. The search recovered eight images of child pornography including the two transmitted ones. *Id*. at 1146. The court rejected the defendant's argument of "exploratory rummaging," *Id*. at 1147, and held the search constitutional because, unlike *Carey*, the searching officers were at all times searching for child pornography—the object of the search warrant—and never "abandoned" the authorized search. *Id*. In *Walser*, the officers obtained a search warrant to search the defendant's hotel room and computer for evidence of possession or sale of controlled substances. *Walser*, 275 F.3d at 983-84. In searching the computer's hard drive for evidence of drug trafficking, the officer opened a Microsoft Word folder, and this opened a second file in the folder, an AVI file that contained a video of child pornography. *Id*. at 984-85. After viewing the video, the officer ceased the search on the hard drive and obtained a new search warrant authorizing a search for evidence of possession of child pornography. *Id*. at 985. While the court stated that officers "cannot simply conduct a sweeping, comprehensive search of a computer's hard drive" because of the amount of private material potentially stored there, it found the search proper because the officers used a clear search methodology and obtained a second warrant as soon as they viewed images they believed fell outside the scope of the initial warrant. *Id*. at 986-87.

evidence of child pornography. *Id*. at 527. Upon discovering the child pornography, the agent ceased his search and obtained a second search warrant to search the computer for child pornography. *Id*. at 528.

The *Gray* court rejected the defense argument that it was unreasonable for the special agent to view the JPG files. *Id*. at 529. The court reasoned that the special agent would have been remiss not to search the JPG files merely because such files are generally picture files and he believed that the materials he sought were most likely to be text files. *Id*. The agent was not required to accept as accurate any file's name or suffix and limit his search accordingly, as experienced hackers often intentionally mislabel files and directories in order to conceal information. *Id*. The court pointed out that in a search for records and documents, "innocuous records must be examined to determine whether they fall in the category of those papers covered by the search warrant. *Id*. at 528; *see also Andersen v. Maryland*, 427 U.S. 462, 482 n.11 (1976). The court further found that even though there may have been less invasive ways of conducting the search, the resolution of the suppression issue "does not turn on whether [the officer] conducted the most technically advanced search possible, but on whether the search was reasonable." *Gray*, 78 F. Supp. 2d at 529 n.8. The *Gray* court concluded that under the circumstances, it was reasonable under the Fourth Amendment for the special agent, in his routine preliminary file review, to open the JPG file, and to cease the search and obtain another warrant after viewing the nature of the material.

"The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Computer searches are no less constitutional than searches of physical

records where innocuous documents may be scanned to ascertain their relevancy." *United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998).

In *State v. Schroeder*, 613 N.W.2d 911 (Wis. App. 2000), an investigation into Internet harassment and disorderly conduct resulted in a conviction for child pornography. A search warrant was issued to enter the defendant's home and seize his computer and related items. Upon inquiry, the defendant told the officers that the computer contained child pornography. While conducting a systematic search of the files on the hard drive for evidence of harassment, a computer analyst found child pornography. The search ceased, and a second warrant was obtained to search for child pornography. After examining *Gray* and *Carey*, the Wisconsin court held that images of child pornography observed when the analyst was systematically searching for harassment evidence was admissible under the plain view doctrine relating to the seizure of contraband or illegal possession of property. The court stated:

> [The computer analyst] testified that when he searches a computer, he systematically goes through and opens user-created files regardless of their names. This makes sense, as the user is free to name a file anything. Were [the computer analyst] to limit his search to files whose names suggest the type of evidence he seeks, it would be all too easy for defendants to hide computer evidence: Name your porn file "1986 tax return" and no one can open it. While systematically opening all user-created files, [the computer analyst] opened one that contained images that he considered child pornography. At that point, he stopped his search and called Malchow [his supervisor]. He did not resume the search and find the rest of the nude images of children until after a second search warrant had been issued.

*Schroeder*, 613 N.W.2d at 915.

In *Rosa v. Commonwealth*, 628 S.E.2d 92 (Va. App. 2006), the search warrant under which the computer was seized was issued relative to the crime of distribution of controlled

substances. Jeffery Deem, a technology specialist, used the Encase program to make a copy of the computer's hard drive and then performed a keyword search. The search program permitted a search of the names and contents of the files. Deem noted that it was common practice to manually open picture files because text (such as chat sessions) could be found in JPG files. Deem stated that he could not determine whether a particular JPG file was within the scope of the search warrant until he opened it to see if it contained relevant information. When Deem opened a JPG file, he viewed an image that he believed to be child pornography. He stopped opening picture files and obtained a second search warrant that allowed him to specifically search for child pornography.

After reviewing *Carey*, *Walser*, *Gray*, and other authorities, the *Rosa* court wrote:

> We agree with the reasoning of these cases. In a search for tangible documents, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be searched.

*Rosa*, 628 S.E.2d at 95 (quoting *Andersen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)). The court added:

> This principle applies equally to a search for electronic files. Moreover, a lawful search extends "to the entire area in which the object of the search may be found."

*Id*. at 95-96 (citing *Kearney v. Commonwealth*, 355 S.E.2d 897, 899 (Va. App. 1987) and *United States v. Ross*, 456 U.S. 798, 820 (1982)).

Keeping in mind the particular facts of the instant case, we find no violation of the Fourth Amendment. The trial court did not abuse its discretion in admitting evidence of the contents of appellant's computer as contended. The sixth ground of error is overruled.

## COMPUTER CONTENTS

In his related seventh point of error, appellant urges that the "trial judge erred in admitting irrelevant and prejudicial extraneous evidence of the contents of appellant's computer." Appellant argues that the evidence was not relevant under Texas Rules of Evidence 401 and 402 and was more prejudicial than probative. *See* Tex. R. Evid. 401, 402, 403. Assuming that the objections were timely made, *see* Tex. R. App. P. 33.1, we observe that appellant did not object on the basis of Rule 404(b), under which the State gave notice and offered the exhibits of which appellant now complains. *See* Tex. R. Evid. 404(b).[20] The trial court gave limiting instructions to the jury that are not the basis of the complaints here. As the State points out, the exhibits were offered under Rule 404(b) as circumstantial evidence of appellant's motive, intent, preparation, plans, and identity.

Appellant complains that the jury was presented with information about his membership in the "necrobabes.com" Web site and substantial and prejudicial images and stories of asphyxiation that had been viewed on his computer. Appellant has briefed points of error six and seven together, making it difficult to determine just which exhibits appellant complains of in point of error seven.

We begin with State's Exhibit 19. Detective Rector testified that in the original search for "sale of homes," that he generated the Internet history of the computer. Later, he parsed out of that history the part associated with "necrobabes.com" detailing appellant's activity with it.

---

[20] As earlier noted in the discussion of the fifth point of error, a general relevancy objection does not preserve an extraneous-offense claim under Rule 404(b) of the Texas Rules of Evidence. *See Medina v. State*, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999).

When offered, appellant's counsel responded: "Subject to the previous rulings of the court, your Honor." The "rulings" were not identified, and the exhibit was admitted into evidence.

State's Exhibit 621 was also generated by Rector and showed Internet activity on the computer on April 27, 2001, with the user-profile of a Patrick Russo and with the use of the AOL (America Online) engine to search for a subject associated to "asphyx." To this exhibit, appellant expressed "no objection." This exhibit is not before us for consideration of its relevancy. State's Exhibits 605 through 618 are the Web pages (introductory screens) from the "necrobabes.com" Web site and available to anyone surfing the Internet. As appellant acknowledged, this was "a Web site which is open to any user of the Internet." State's Exhibits 623 through 724 were copies of images and stories that Detective Rector, with a lab computer, recreated from the Web site "necrobabes.com" using information from the Internet history of appellant's computer as to when appellant accessed the Web site. This was done with the consent of the Web site operator. There were 1,200 images recovered. Only the numbered exhibits were admitted into evidence. The trial court was careful to eliminate images of unrelated sexual activity and nudity, leaving only those images showing ligature and manual strangulation of women and other items pertinent to this circumstantial evidence case where a woman was strangled in her own home. The trial court further limited the admitted images to those that appellant viewed on his computer between the dates of October 7 through November 13, 2001, the latter date being two days before the murder occurred. The State was able to tie some of the viewings to the dates that appellant visited some of the female homeowners and realtors, in order to show intent and motive.

43

Appellant does not claim that any one exhibit or one set of exhibits was irrelevant and prejudicial but urges that all the named exhibits fell into that category. Appellant generally complains that all the exhibits were irrelevant, but if relevant, their probative value was substantially outweighed by their prejudicial effect. *See* Tex. R. Evid. 403. Appellant argues that the evidence held appellant up to public ridicule and shame and had little effect upon a fact of consequence. We disagree. The evidence was relevant. Almost any relevant evidence offered by one party is going to be prejudicial to the opposing party. Only "unfair prejudice" as set forth in Rule 403 provides a basis for excluding relevant evidence. *Fletcher v. State*, 852 S.W.2d 271, 277 (Tex. App.—Dallas 1993, pet. ref'd).

We need not repeat the applicable authorities cited in our discussion under the fifth point of error. We conclude that the trial court did not abuse its discretion in admitting the exhibits as relevant evidence, or in finding through the balancing process that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The seventh point of error is overruled.

**HEARSAY**

In his eighth point of error, appellant contends that the "trial judge erred in the admission of a hearsay statement." Appellant's brief, however, relates to several statements by the witness Cynthia Barajas.

In the absence of the jury, the trial court conducted a hearing on Barajas's testimony and made its rulings. Appellant relies upon his hearsay objections at the hearing to preserve any

error, because he made no further objections when Barajas testified before the jury shortly thereafter. *See* Tex. R. Evid. 103(a)(1).

Barajas, from Los Angeles, California, testified before the jury that she was an IBM coworker with Diane Holik. They had weekly telephone conferences about their team work concerning IBM employees every Thursday morning about 10:30 a.m., central time (in Austin). Barajas knew about Holik's personal life, that Holik lived alone and worked from her home, that Holik had an upcoming marriage and wanted to sell her Austin home, and that Holik had Thanksgiving holiday plans with her fiancé.

On Thursday, November 15, 2001, after some difficulty in reaching Holik that morning for their weekly conference, Barajas talked to Holik in her home on the phone about 12:45 p.m. Austin time. Barajas related that Holik gave an explanation for why she was late. "She said, this guy just left." When asked about the length of time "from when the man had been there to when you talked to her (Holik) on the phone," Barajas responded, "Just moments."[21] Barajas testified that Holik told her that she [Holik] had plans to meet this man and his wife the following Saturday to show her house. Barajas related that Holik was excited to be selling her home and was eager to do so.[22]

Barajas testified that she warned Holik not to let strangers in her home when she was alone. Subsequently in the conversation, Barajas recalled that Holik panicked when she realized

---

[21] There was no objection to this latter statement which was Barajas's opinion, not a present sense impression exception to the hearsay rule. At the hearing in the jury's absence, Barajas testifed that when Holik answered the telephone, she (Barajas) heard "a commotion." This evidence was not repeated before the jury.

[22] In the jury's absence, Barajas testified that Holik told her that the man offered "cash" for her home. The State did not offer this evidence before the jury.

45

that she did not have her engagement ring and said, "Oh, my God." Barajas heard retreating foot steps after Holik put the phone down. Barajas then stated, "[S]he came back, she picked up the phone and she said, 'they are back on'." Barajas estimated that her conversation with Holik concluded about 1:30 p.m. that afternoon.

At the hearing in the jury's absence, the trial court overruled appellant's hearsay objection to the "this guy just left" testimony on the basis of the present sense impression exception to the hearsay rule. *See* Tex. R. Evid. 803(1). The trial court also overruled appellate's separate hearsay objection to Barajas's testimony about Holik's plan or intention to meet the man on the weekend. The basis of this latter ruling was the state of mind exception to the hearsay rule. *See* Tex. R. Evid. 803 (3). At the hearing, appellant agreed that Barajas's warning to Holik was not hearsay and expressly stated that he had "no objection" to the testimony about Holik's recovery of her ring or rings.

### THE RULES

"Hearsay" is a statement other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.

Tex. R. Evid. 801(d).

Rule 802 of the Texas Rules of Evidence states:

Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority. Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.

Tex. R. Evid. 802.

46

Texas Rules of Evidence 803 provides a number of exceptions to the hearsay rule, including the present sense impression and state of mind exceptions here involved. Tex. R. Evid. 803. Rule 803 in part provides:

> The following are not excluded by the hearsay rule, even if the declarant is available as witness:
>
> (1) **Present Sense Impression**. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
>
> . . . .
>
> (3) **Then Existing Mental Emotional or Physical Condition**. A statement of the declarant's the existing state of mind, emotion, sensations or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tex. R. Evid. 803.

## STANDARD OF REVIEW

Whether to admit an out-of-court statement under an exception to the hearsay rule is committed to the trial court's discretion. *See Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1996); *Cardenas v. State*, 115 S.W.3d 54, 62 (Tex. App.—San Antonio 2003, no pet.). A trial court abuses its discretion in the context of evidentiary rulings only if its ruling is outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153-56

(Tex. Crim. App. 2001). A trial court's evidentiary ruling on a hearsay objection must be upheld absent an abuse of discretion. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994).

Barajas's testimony that she telephoned and finally contacted Holik on November 15, 2001, and that Holik simply gave an explanation for the delay (without more) is not hearsay. The trial court, however, did admit Barajas's testimony that Holik said, "This guy just left" under Rule 803(1) over a hearsay objection. The rationale for the present sense impression exception to the hearsay rule is that (1) the report at the moment of the thing then seen or heard is safe from any error from defect of memory of the declarant, and (2) there is little or no time for a calculated misstatement. *See Rabbani v. State*, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992); *Anderson v. State*, 15 S.W.3d 177, 183 (Tex. App.—Texarkana 2000, no pet.).

It has been said that three principal requirements must be met before hearsay evidence may be admitted as a present sense impression: (1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration must be contemporaneous with the event. *See United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998); *accord United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001).

"[C]ontemporaneity of the event and the declaration by itself, should be a sufficient guarantee for admissibility. . . . Contemporaneity of the event may be inferred circumstantially." 2 Steven Goode, Olin Guy Wellborn, III & M. Michael Sharlot, *Texas Practice: Guide to the Texas Rules of Evidence* § 803.2 (3d ed. 2002) (citing *Vanderhorst v. State*, 821 S.W.2d 180, 183 (Tex. App.—Eastland 1991, pet. ref'd)).

48

Rule 803(1) requires that the declaration, if not simultaneous with the event, be made "immediately thereafter." "Immediately" may permit only a slight lapse of time. *See United States v. Hawkins*, 59 F.3d 722, 730 (8th Cir. 1995); *cf. Cardenas v. State*, 115 S.W.3d at 62-63. (statement to neighbor who lived less than one minute away that particular man was in declarant's apartment was made "immediately thereafter."[23] "A functional test should be applied, i.e., whether the proximity in time is sufficient to reduce the hearsay danger of faulty memory and insincerity." Goode, § 803.2 (citing *Beauchamp v. State*, 870 S.W.2d 649, 653 (Tex. App.—El Paso 1994, pet. ref'd)).

"A person who is observing or experiencing something may explain or describe it to someone else over the telephone. In such an event, what the listener on the telephone hears is a present sense impression." David F. Binder, *Trial Practice Series, Hearsay Handbook* § 8: 1 at 8.6 (4th ed. 2001) (citing *Brown v. Tard*, 552 F. Supp. 1341, 1350-51 (D.N.J. 1982); *Booth v. State*, 306 Md. 313, 508 A2d 976, 985 (1986); *State v. Flesher*, 286 N.W.2d 215, 216 (Iowa 1979)).

In *Brown*, a maintenance worker at an apartment building was convicted of murdering a tenant's live-in girlfriend, Shelby Weinstein. The tenant (Hickson) testified that the victim called him on the telephone and stated that she was not going to work and that "the guy is here to fix the air conditioner." The court wrote:

> Shelby Weinstein's statement that a man was there to fix the air conditioner meets
> the requirement that the declarant personally perceive the event, that the statement

---

[23] For a more liberal view of the requirement of contemporaneousness, *see United States v. Parker*, 936 F.2d 950, 954 (7th Cir. 1991); *United States v. Blakey*, 607 F.2d 779, 784-86 (7th Cir. 1979).

> explain or describe the event, and that there be contemporaneity of the statement and the event described. Hickson's testimony thus falls within the present sense impression exception to the hearsay rule.

*Brown*, 552 F. Supp. at 1351; *see also Franklin v. State*, 858 S.W.2d 537, 543-44 (Tex. App.—Beaumont 1993, no pet.).

Here, Holik's statement to Barajas over the telephone that "This guy just left" was contemporaneous with the event it described or certainly it could be inferred circumstantially. The statement met all the requisites as described in *Brown*. Therefore, the trial court did not abuse its discretion in admitting this testimony under Rule 803(1).

## STATE OF MIND EXCEPTION

Despite the manner in which Barajas's testimony about Holik's plans was presented at the separate hearing, the prosecution made clear that it was offering the testimony under the state of mind exception to the hearsay rule. Appellant's hearsay objection was overruled. The testimony presented before the jury showed that Holik planned and had the intent to meet the man who "just left" the following Saturday. She was excited about the real possibility of selling her home.

In *Fain v. State*, 986 S.W.2d 666, 680 (Tex. App.—Austin 1998, pet. ref'd), a murder case, the trial court admitted under Rule 803(3) the victim's statement to a third party that she was frustrated in the relationship, but intended to continue the relationship with the defendant. This court found no abuse of discretion in the admission, pointing out that "the complained-of evidence was offered to show the victim's state of mind on July 10, some two weeks before her disappearance, as to her intent to continue her relationship with Fain." *Id.* at 680; *see also Saldivar*

50

*v. State*, 980 S.W.2d 475, 495 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (finding under Rule 803(3) that the trial court did not err in admitting into evidence the murder victim's prior statement that she was going to fire defendant, an employee); *Pena v. State*, 864 S.W.2d 147, 149-150 (Tex. App.—Waco 1993, no pet.) (upholding admission under Rule 803(3) of murder victim's statement that she wanted to leave defendant, but felt economically trapped); *Norton v. State*, 771 S.W.2d 160, 165-66 (Tex. App.—Texarkana 1989, pet. ref'd) (finding no abuse of discretion in admission of prior statement by murder victim that he intended to go to defendant's shop); *see Green v. State*, 839 S.W.2d 935, 942 (Tex. App.—Waco 1992, pet. ref'd) ("Texas precedent allows state-of-mind declarations to be admitted to prove the joint conduct of the declarant and another").

Still further, in a murder case, the intention of the victim to go somewhere or to meet someone may be proved by evidence of the victim's out-of-court assertion of intent. *Commonwealth v. Marshall*, 135 A.301, 304 (Pa. 1926) (on morning of her death, victim told fellow passenger on train that she was going to meet defendant that evening).

We conclude that the trial court did not abuse its discretion under Rule 803(3) in admitting the statements concerning Holik's plan and intent to meet the "man" on the following Saturday.

In his brief, appellant urges that the evidence admitted over his hearsay objections had no relevancy to any material issue in the case. Appellant overlooks the fact that at no time did he advance any relevancy objection at trial as required. *See* Tex. R. App. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (claim of error not preserved where defendant objected on the ground the testimony was hearsay, but failed to object to the relevancy of the testimony).

51

The eighth point of error is overruled.

The judgment is affirmed.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Puryear and Onion*

Affirmed

Filed:   June 7, 2007

Publish

* Before John F. Onion, Jr., Presiding Judge (retired), Texas Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).