02-10-432-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00432-CR

 

 


 
 
 Ryan Harrison
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

----------

FROM THE 158th
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

In nineteen
points, Appellant Ryan Harrison appeals his capital murder conviction.  We
reverse and remand.

II. 
Factual and Procedural History

On
June 25, 2009, the State indicted Harrison for allegedly murdering Germaine
Dawson while in the course of committing a robbery on March 25, 2009.

A. 
Testimony at Trial

Josh
Madden testified that on March 25, 2009, he gave Harrison’s phone number to
Dawson with the understanding that Dawson and Harrison were going to conduct a
drug deal involving high grade “hydro” marijuana.  Tremayne Standberry,
Dawson’s neighbor, testified that between 3:00 p.m. and 5:00 p.m. that
afternoon, Dawson obtained from Standberry’s apartment two ounces of marijuana,
which Harrison was supposed to buy for $500 an ounce.  Madden testified that
between 6:05 p.m. and 6:15 p.m. that evening, Dawson called him to ask how
far away the meeting location in Lewisville was.  Melissa Buchanan, Dawson’s
girlfriend, testified that she had been text messaging Dawson throughout the
afternoon and evening of March 25 but that Dawson had stopped replying between
7:00 p.m. and 7:30 p.m.  And Standberry testified that Dawson did not
return home that night.

On
March 26, 2009, Harrison, Madden, and Standberry engaged in a three-way
telephone conversation.[2]  Madden testified that
during the conversation Harrison said, “The deal went
left. . . .  The bitch got crazy, and I had to hit that ho
nine times, and I let off six and three stayed in the chamber.”  Madden stated
that Harrison hung up the phone but called back later explaining that “the deal
went left” and that they both went their separate ways.  Perry testified that
this conversation was on speaker mode and that Harrison said that “things were
supposed to go right but they went left.”  She testified that when she asked
Harrison where Dawson was, Harrison hung up and would not answer his phone
after that.  Standberry testified that Harrison[3] told him during the
conversation that he had the money and the marijuana but that Standberry said
that he was not concerned about either of those and simply wanted to know if
Dawson was okay.  In response, Harrison told Standberry that the deal “went
left,” which Standberry understood to mean that the deal had gone badly.

According
to the autopsy results, the cause of Dawson’s death was homicide by multiple
gunshot wounds to the head.  Detective Wawro testified that he believed that
the murder occurred between 7:15 p.m. and 7:30 p.m. on March 25, 2009.

B. 
Harrison’s Statement

Harrison
was arrested on March 31, 2009, but in his recorded interview with Detective
Wawro, Harrison said that he did not know that he was being arrested for
murder.  He also denied having been involved in a drug transaction.  Harrison
claimed that he had planned to buy a cubit[4] of marijuana for $250
from a person whose phone number Madden had given to him but that he did not
end up meeting this person because he lacked transportation to meet him in
Lewisville.[5]  He stated that Madden
and Madden’s girlfriend had called him later that evening to ask about Dawson’s
whereabouts but that he told them that he had been unable to meet with Dawson.

Harrison
stated that on the day in question, he was using a cell phone that belonged to
his cousin, Derrick Day, because Sprint disconnected Harrison’s cell phone due
to his inability to pay his bill.[6]  Harrison said that he
stayed at Day’s house all day and had Day’s cell phone with him the entire
time.

When
Detective Wawro told Harrison that cell phone records indicated that he had
been in Lewisville that evening, Harrison admitted that he was at the drug deal
with Madden but denied being the shooter.  Harrison said that Madden had picked
him up at his aunt’s house and that Harrison stayed in the car while Madden
went into Dawson’s car to conduct the transaction.  Harrison said that he did
not know what went wrong but that he heard gunshots and that Madden returned to
the car and drove Harrison back to his aunt’s house.  Detective Wawro told
Harrison that Madden could not have been with Harrison that evening because
Madden’s phone was in Denton immediately after the murder.[7] 
Harrison said that Madden’s girlfriend had Madden’s phone that evening, that
Madden was using Day’s phone while Madden and Harrison were together, and that
Harrison did not personally send any text messages from that phone during that
period of time.

When
Detective Wawro told Harrison that he knew that Harrison was in Dawson’s car,
Harrison admitted that he was in the front seat doing the drug deal with Dawson
while Madden sat in the back seat.  Harrison stated that he was holding the
marijuana to inspect it when, before he was able to pay Dawson, Madden shot
Dawson multiple times and grabbed the marijuana from Harrison.  Harrison
admitted that he had told some of Dawson’s friends that he had the marijuana,
but he told Detective Wawro that he said this only to protect Madden.

C. 
Cell Phone Records

The trial
court admitted into evidence call detail records for the cell phones belonging
to Day,[8] Dawson,[9]
Madden ,[10] and Harrison.[11] 
Using both the information in these records and the cell towers with which each
cell phone “communicated,” Denton Police Department Detective Keith Martin
determined the approximate locations of these four individuals when they were
using their cell phones from 5:30 p.m. to 11:30 p.m. on March 25, 2009.

Detective
Martin testified that at 6:15 p.m., Madden’s phone was near his Denton residence,
Dawson’s phone was near his Lewisville residence, and Harrison’s and Day’s
phones were in southeast Dallas.  Detective Martin testified that from
6:45 p.m. to 7:00 p.m., Madden’s phone remained near his residence,
Dawson’s phone had moved to the murder scene, and Harrison’s and Day’s phones
had moved northerly up Interstate 35.  At 7:15 p.m., Madden’s phone remained in
the same location, Harrison’s phone could not be located because it had no
activity, and Dawson’s and Day’s phones were at the scene of the murder.  At
7:45 p.m., Madden’s phone remained in the same location, but Dawson’s and
Day’s phones were near Day’s residence by 8:00 p.m.  At 9:15 p.m.,
Harrison’s, Day’s, and Dawson’s phones all had activity near Harrison’s
residence.

Harrison
moved for a directed verdict, but the trial court denied this motion, and the
jury found Harrison guilty and sentenced him to life in prison without parole.

III.  Denial
of Directed Verdict

In
his fifteenth point, Harrison claims that the trial court erred by denying his
motion for directed verdict because the evidence was legally insufficient to
support his conviction for capital murder, and he asks us to reverse the
judgment and enter an order of acquittal.

A.  Standard
of Review

A
challenge to the denial of a motion for instructed verdict is actually a
challenge to the sufficiency of the evidence.  Canales v. State, 98
S.W.3d 690, 693 (Tex. Crim. App.), cert. denied, 540 U.S. 1051 (2003); McCown
v. State, 192 S.W.3d 158, 160 (Tex. App.—Fort Worth 2006, pet. ref’d).  In
our due-process review of the sufficiency of the evidence to support a
conviction, we view all of the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Isassi v.
State, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts.  Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; Isassi, 330 S.W.3d at 638.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); Brown v. State, 270
S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 2075
(2009).  Thus, when performing an evidentiary sufficiency review, we may not
re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the factfinder.  Williams v. State, 235 S.W.3d 742,
750 (Tex. Crim. App. 2007).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@  Hooper v. State, 214 S.W.3d 9,
16–17 (Tex. Crim. App. 2007).  We must presume that the factfinder resolved any
conflicting inferences in favor of the verdict and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Isassi, 330 S.W.3d at 638; Matson
v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991) (holding that in
determining the sufficiency of the evidence to show an appellant’s intent and
faced with a record that supports conflicting inferences, we “must presume—even
if it does not affirmatively appear in the record—that the trier of fact
resolved any such conflict in favor of the prosecution, and must defer to that
resolution”).

We
must consider all the evidence admitted at trial, even improperly admitted
evidence, when performing a sufficiency review.  Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007); Moff v. State, 131 S.W.3d
485, 489–90 (Tex. Crim. App. 2004).  The standard of review is the same for
direct and circumstantial evidence cases; circumstantial evidence is as
probative as direct evidence in establishing the guilt of an actor.  Isassi,
330 S.W.3d at 638; Hooper, 214 S.W.3d at 13.

B.  Law

In
capital murder offenses committed during the course of a robbery, Tex. Penal
Code Ann. § 19.03(a)(2) (West Supp. 2011),[12] the
legal sufficiency standard applies to both the charged and underlying
offenses.  Russo v. State, 228 S.W.3d 779, 792 (Tex. App.—Austin
2007, pet. ref’d) (citing Matamoros v. State, 901 S.W.2d 470, 474 (Tex.
Crim. App. 1995)).  To establish the murder portion of the offense, the State
must prove beyond a reasonable doubt that the defendant intentionally or
knowingly caused the death of an individual as charged in the indictment.[13]  Tex.
Penal Code Ann. § 19.02(b)(1) (West 2011); Russo,
228 S.W.3d at 792.

For
murder to qualify as capital murder in the course of a robbery,[14] the
defendant’s intent to rob must be formed before or at the time of the murder. Conner
v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).  Proof of robbery “committed
as an afterthought and unrelated to a murder” is not sufficient evidence of
capital murder.  Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App.
1995); Nelson v. State, 848 S.W.2d 126, 131 (Tex. Crim. App. 1992), cert.
denied, 510 U.S. 830 (1993) (“The point at which appellant formulated his
intent to take his victim’s property is critical to differentiating, in the
abstract, between his commission of capital murder in the course of robbery and
his commission of first degree murder, followed by theft.”).  If the jury could
“rationally conclude beyond a reasonable doubt that the defendant formed the
intent to obtain or maintain control of the victim’s property either before or
during the commission of the murder, then the State has proven that the murder
occurred in the course of the robbery.”  Conner, 67 S.W.3d at 197.  This
is true even when the appropriation occurred after the murder.  Nelson,
848 S.W.2d at 132.  “[T]he requisite intent may be inferred from circumstantial
evidence and from the defendant’s conduct.”  Maldonado v. State, 998
S.W.2d 239, 243 (Tex. Crim. App. 1999).

C. 
Sufficiency Analysis

1. 
Murder

Madden
testified, even if his testimony was improperly admitted, that Harrison said,
in reference to the drug deal, that he “hit that ho nine times” and “let off
six and three stayed in the chamber.”  See Clayton, 235 S.W.3d at 778.  It
was reasonable for the jury to infer from this evidence that Harrison was
telling Madden that he had shot Dawson with a firearm.  See Hooper, 214
S.W.3d at 16–17.  It was also reasonable for the jury to infer that Harrison
had the requisite intent when he shot Dawson because there was evidence that
Harrison also told Madden that the “bitch got crazy” so he “had to” do what he
did, which indicates that he responded knowingly or intentionally when, as
other witnesses testified, the deal “went left.”  See Tex. Penal Code
Ann. § 19.02(b)(1); Hooper, 214 S.W.3d at 16–17.  Therefore, based
on this evidence, a rational trier of fact could have found that Harrison
intentionally or knowingly caused Dawson’s death by shooting him with a firearm
as alleged in the indictment.  See Tex. Penal Code Ann. § 19.02(b)(1);
Isassi, 330 S.W.3d at 638; Russo, 228 S.W.3d at 792.

Harrison
controverted this evidence by telling Detective Wawro that Madden was the
shooter.  However, it was the jury’s responsibility to resolve the conflicts
between the witnesses’ testimony and Harrison’s statement and to judge the
weight and credibility of the evidence.  See Isassi, 330 S.W.3d at 638; Brown,
270 S.W.3d at 568.  And we do not substitute our judgment for that of the jury,
see Williams, 235 S.W.3d at 750, but instead determine whether the
jury’s inferences were reasonable based on the combined and cumulative force of
all of the evidence when viewed in the appropriate light.  See Hooper,
214 S.W.3d at 16–17.

It
was reasonable for the jury to discredit Harrison’s statement that Madden was
the shooter because the evidence showed that Madden’s phone remained near
Madden’s Denton residence all evening on March 25, while Harrison’s and Day’s
phones moved from southeast Dallas to the murder scene and then back to
southeast Dallas with Dawson’s phone that evening.  See id.  Harrison
tried to explain this by saying that Madden’s girlfriend had Madden’s phone in
Denton at the time of the murder.  However, it was reasonable for the jury to infer
that Madden, who was in Denton when he gave Dawson directions between
6:05 p.m. and 6:15 p.m., could not have driven to southeast Dallas to
pick up Harrison in time for Harrison’s phone to have been detected moving
northerly on Interstate 35 at 6:45 p.m.  See id.

Furthermore,
the evidence shows that Harrison changed his story several times during his
interview with Detective Wawro, and because the jurors are the sole judge of
the weight and credibility of the evidence, see Brown, 270 S.W.3d at 568,
it was reasonable for them to conclude that Harrison was being untruthful and
lacked credibility and to disbelieve his version of the events.  See Hooper,
214 S.W.3d at 16–17.  Therefore, we presume that the jury resolved any conflicting
inferences against Harrison and defer to that resolution.  See Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Isassi, 330 S.W.3d at 638.  Accordingly,
viewing all of the evidence in the light most favorable to the verdict, we
conclude that a rational trier of fact could have found the essential elements
of murder beyond a reasonable doubt.  See Jackson, 443 U.S. at 319, 99
S. Ct. at 2789; Isassi, 330 S.W.3d at 638.

2. 
Robbery

Turning
to the underlying offense of robbery, it was reasonable for the jury to
conclude beyond a reasonable doubt that Harrison had formed the intent to
obtain control of Dawson’s marijuana either before or during the murder.  See
Conner, 67 S.W.3d at 197.  As an initial matter, it was reasonable for the
jury to conclude that Harrison stole the marijuana because Standberry testified
that Harrison admitted on the morning after the murder that he possessed the
marijuana.  See Williams v. State, 937 S.W.2d 479, 483 (Tex. Crim. App.
1996) (recognizing that the fact that appellant murdered the victim rationally
supports the conclusion that the items were stolen rather than taken with
consent).

Also,
Harrison’s theft of the marijuana was not “an afterthought and unrelated to [the]
murder” because he admitted that he met with Dawson intending to obtain
marijuana, and the evidence demonstrates that he never intended to pay for it. 
See Alvarado, 912 S.W.2d at 207.  First, witnesses testified,
even if their testimony was improperly admitted, that Harrison planned to meet Dawson
to obtain two ounces of high grade “hydro” marijuana that was priced at $500
per ounce.  See Clayton, 235 S.W.3d at 778.  However, Harrison stated
that he and two of the three family members with whom he lived were unemployed
and that Sprint had shut his phone off because the bill was more than he could
afford.  From this evidence, it was reasonable for the jury to infer that
Harrison did not have enough money to give Dawson $1,000 and, therefore, could
not have intended to pay for the marijuana but, instead, met Dawson with the
intent to steal the drugs.  See Hooper, 214 S.W.3d at 16–17; Russo,
228 S.W.3d at 794 (stating that motive, such as being in financial straits
at the time of the murder, is not an element of robbery but is relevant as a
circumstance tending to prove guilt).

This
inference is further supported by the contradiction between Harrison’s
statement that he was supposed to get one-quarter pound of marijuana for $250
and the evidence showing that he was supposed to buy half that much marijuana
for four times the cost.  Because of this inconsistency, it was reasonable for
the jury to infer that Harrison lied about the amount and cost of the marijuana
to make his story that he planned to pay for the drugs more believable.  See
Hooper, 214 S.W.3d at 16–17.  Based on the combined and cumulative force of
this evidence, we conclude that it was reasonable for the jury to infer that
Harrison never intended to pay for the marijuana but, instead, intended to
steal the marijuana from Dawson.  See id.; Matson, 819 S.W.2d at
846.

Harrison
claims that the evidence is insufficient to prove robbery because the marijuana
was not recovered at all, much less recovered in his possession.  However, there
is no legal requirement that property stolen must be recovered in whole or in part
to constitute the offense of robbery.  Russo, 228 S.W.3d at 794 (citing
Chaney v. State, 474 S.W.2d 711, 712 (Tex. Crim. App. 1972)).  While
Harrison told Detective Wawro that Madden took the marijuana, it was the jury’s
responsibility to resolve the conflicts in the evidence and to judge the weight
and credibility of the evidence.  See Isassi, 330 S.W.3d at 638; Brown,
270 S.W.3d at 568.  And we do not substitute our judgment for that of the
jury.  See Williams, 235 S.W.3d at 750.  Instead, we presume that the
jury resolved any conflicting inferences against Harrison and defer to that
resolution.  See Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Isassi,
330 S.W.3d at 638.

Therefore,
when viewing the evidence in the light most favorable to the verdict, we
conclude that a rational jury could have found beyond a reasonable doubt all of
the essential elements of capital murder, including the aggravating element of
robbery involving the timely formed intent.  See Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Isassi, 330 S.W.3d at 638; Russo,
228 S.W.3d at 795.  Accordingly, we overrule Harrison’s fifteenth point.

IV. 
Public Trial

In
his first point, Harrison contends that the trial court violated his
constitutional right to a public trial by excluding his family members and his
friend from the voir dire proceeding.

A.  Pertinent
Facts

When
Harrison requested that his mother, grandmother, and friend be permitted to sit
in the courtroom during the voir dire proceeding, the following exchange
ensued:

[DEFENSE COUNSEL]:  And we would request that the family
members be able to sit.  Pursuant to the seating chart, it looks as if the jury
box, which has at least 12 seats, will have seats unavailable or – excuse me –
seats available for them to be able to view the jury selection of this trial
and we’d request that they be allowed to be present.

[THE STATE]:  Judge, there are no seats in the gallery
available, and I think that determines whether or not someone can come in and
sit and watch a trial.  When a courtroom is full, the courtroom is full.

I’m assuming, Your Honor, that you are going to allow
them to be present during all other portions of trial, as well as the victim’s
family.

If the defendant’s family should be allowed to sit in the
jury box, we’re going to have to ask that the victim’s family be allowed to sit
in the jury box, which I think also may cause a problem if you’re having both
families sitting in a small jury box.

I think if there was room in the courtroom, obviously
they should be able to sit, but I don’t think there’s any available seats. 
We’re even taking up seats all the way through the back.  There isn’t a single
inch of space available in the gallery, and I think that’s what predicates
whether or not someone can be seated.

THE COURT:  I agree with the state.  The motion is
denied.  Bring the jury in.

[DEFENSE COUNSEL]:  Well, Judge, also for the record, the
seating chart that I have got has folks sitting on the opposite side of the
bar.  Jurors number 46 through 50 and 51 through 55 will actually be on the
other side of the gallery.  Those folks could either be moved over to the jury
box – 

THE COURT:  Denied.  Bring the jury
in, Sheriff.

Two
days later, and after voir dire had been completed, defense counsel made the
following bystander bill:

Q.  Are you representing Ryan Harrison with me in this
particular matter?

A.  Yes.

Q.  Were you present on Monday, August 16th, before jury
selection?

A.  Yes.

Q.  At that period of time, did we have individuals that
wished to watch the voir dire proceedings?

A.  We did.

Q.  Who?

A.  Pearly, his mother Regina, and a family friend.

Q.  And were they present in the courtroom prior to the
venire being brought up?

A.  They were.

Q.  And were we apprised that they would not be allowed
to be present during voir dire?

A.  We were.

Q.  Now let’s go to the actual venire.  Were all the
seats occupied in the gallery?

A.  Yes.

Q.  And, in fact, were individuals allowed to come to the
other side of the railing and sit on the hard benches that are directly behind
counsel table?

A.  Yes.

Q.  How many people were in the jury box during voir
dire?

A.  None.

Q.  And is the courtroom large enough to where it could
accommodate folding seats and/or empty seats to accommodate these three
individuals?

A.  Yes, both in the courtroom and in the aisle between
the bench and the exit to the courtroom.

Q.  Are you aware if other district courts have allowed
individuals to sit in the jury box during voir dire?

A.  I am.

Q.  And have they been allowed to?

A.  Yes.

Q.  Thank you.

[DEFENSE COUNSEL]:  That perfects the bill, Judge.  Thank
you.

[THE STATE]:  Just a few questions,
Your Honor.

[DEFENSE COUNSEL]:  It’s a bill, Judge.  It’s not open
for cross-examination.

[THE STATE]:  Then I’ll just state for the record that
there were no other – there was no victim family members in here during voir
dire, either.  There were no other spectators at all during voir dire because
there was no room.

THE COURT:  Further, for the record, the only people that
are ever sat in the jury box while we were doing voir dire since I have been
judge have been interns from the DA’s office, people like that.  There have
never been any parties, any associates of parties, there have never been any
relatives of parties.

I would consider it extremely dangerous to have placed
those people anywhere other than in the gallery, and the gallery was full.

B. 
Law

“In
all criminal prosecutions, the accused shall enjoy the right to
a . . . public trial.”  U.S. Const. amend. VI; Duncan v.
Louisiana, 391 U.S. 145, 148, 88 S. Ct. 1444, 1446–47 (1968) (recognizing
that this right is protected against state action by the Due Process Clause of
the Fourteenth Amendment).  In Presley v. Georgia, the United States
Supreme Court decided that it is “well settled” that an accused’s Sixth
Amendment right to a public trial extends to voir dire proceedings.  130 S. Ct.
721, 723–24 (2010) (citing Waller v. Georgia, 467 U.S. 39, 104 S. Ct.
2210 (1984)).  Under the Waller test, a trial court may exclude the
public under the following circumstances:

[T]he party seeking to close the hearing must advance an
overriding interest that is likely to be prejudiced, the closure must be no
broader than necessary to protect that interest, the trial court must consider
reasonable alternatives to closing the proceeding, and it must make findings
adequate to support the closure.

467
U.S. at 48, 104 S. Ct. at 2216.  “Such circumstances will be rare, however, and
the balance of interests must be struck with special care.”  Id. at 45,
104 S. Ct. at 2215.

1. 
Overriding Interest

With
respect to the first and fourth Waller requirements, despite the
existence of weighty interests, a trial court’s “broad and general” findings
will not justify closure.  Id. at 48, 104 S. Ct. at 2216.

The generic risk of jurors overhearing prejudicial
remarks, unsubstantiated by any specific threat or incident, is inherent
whenever members of the public are present during the selection of jurors. If
broad concerns of this sort were sufficient to override a defendant’s
constitutional right to a public trial, a court could exclude the public from
jury selection almost as a matter of course. . . .

There are no doubt circumstances where
a judge could conclude that threats of improper communications with jurors or
safety concerns are concrete enough to warrant closing voir dire.  But
in those cases, the particular interest, and threat to that interest, must “be
articulated along with findings specific enough that a reviewing court can
determine whether the closure order was properly entered.”

Presley, 130
S. Ct. at 725 (quoting Press-Enter. Co. v. Super. Ct. of Cal., Riverside
Cnty., 464 U.S. 501, 510, 104 S. Ct. 819, 824 (1984)).

Granting
petition to review for the first time an appellate court’s application of Presley,
the court of criminal appeals recognized that jury-panel contamination and
courtroom security are “indeed substantial concerns” but held that the trial
court failed to “identify specific circumstances sufficient to remove its
concerns . . . from the realm of the generic.”  Steadman
v. State, No. PD-1356-10, 2012 WL 716010, at *6 (Tex. Crim. App. Mar. 7,
2012) (“Under Presley, it is obvious that either one alone could be
sufficiently momentous to warrant closure under the appropriate
circumstances.”).  Before voir dire in Steadman, the trial court insisted
that the gallery was full and denied Steadman’s request to seat his family
members in the jury box or to allow them to sit or stand elsewhere in the
courtroom, but the trial court “made no further explanation on the record why
the appellant’s family members would not be allowed in the courtroom during
voir dire.”  Id. at *1–2.  Long after voir dire had been conducted, the
trial court retrospectively entered express findings of fact,[15]
which included in part:

[1].  The space on each side of the gallery area is
narrow.  Persons standing or sitting in that area would be in close proximity
to one or more of the persons on the panel.

[2].  The case on trial was one which was expected to be
“emotionally-charged[.]”

[3].  The Court believed that having one or more of the
Defendant’s family members sitting in close proximity to the panel members
would make such panel members uncomfortable and reticent to fully express their
feelings, attitudes and possible prejudices.

[4].  There was space adequate for the Defendant’s family
members to sit or stand in the area behind “the bar,” and in front of the
bench.

[5].  The space behind the bar [a]nd in front of the
bench is reserved for parties, their attorneys, the attorney’s support staff
and court personnel.

[6].  Allowing persons other than the parties, their
attorneys, the attorney’s staff and court personnel in this space creates
security concerns.

[7].  Security concerns are heightened in this case.

[8].  Placing chairs for family members to sit in the area
in front of the bench would interfere with access by the Court bailiff and
other security personnel to the Defendant.

[9].  There was space adequate for the Defendant’s family
to sit or stand in the jury box.

[10].  The jury box is reserved for the selected jury
members during a jury trial.

. . . .

[11].  There are no other courtrooms in the Taylor County
Courthouse larger than the 350th District Court courtroom.

[12].  The central jury room on the first floor of the
Taylor County Courthouse is a significantly larger space than the 350th
District Court courtroom.

[13].  Moving the voir dire proceedings to the central
jury room area after the sixty person panel had been seated could cause delay.

[14].  The central jury room is not configured as a
courtroom.  [Its] use as a venue for voir dire is inconvenient.

[15].  The central jury room is less secure than the
350th District Court.  In March, 2008, the Taylor County Courthouse did not use
a metal detector or otherwise restrict the public’s open access to the first
floor.

[16].  The Court did not seek to close the voir dire
process but only to control the courtroom arrangement for security and decorum
purposes.

Id. at *3.

In
light of these findings, the court of criminal appeals reasoned that “[w]hile
the judge identified two ‘particular interests’ sufficient, in the abstract, to
exclude the public, he failed to ‘articulate’ a tangible ‘threat’ to either of
the interests he identified.”
 Id. at *6 (citing Presley, 130 S. Ct. at 725) (“Presley
took pains to emphasize that ‘broad’ or ‘generic’ concerns will not serve to
justify closure; otherwise, they could become talismans for exclusion of the
public in any and every case.”).

As
for jury-panel contamination resulting from the close proximity between
spectators and prospective jurors, the court emphasized the inexistence of
concrete facts related to this concern other than the “space limitations in the
courtroom itself.”  Id. at *7.  The court clarified that concrete facts
might include “evidence of any outburst on the part of the appellant’s family
members,” a “history of such outbursts in prior court proceedings,” a
“particular basis to suppose that the family members would attempt to speak to,
or otherwise try to communicate with or influence, any of the prospective jurors
simply because of their proximity.”  Id.  “Without more tangible
evidence of an actual or impending threat,” the court concluded that the trial
court’s belief or fear regarding jury-panel contamination could not actually
constitute an overriding interest.  Id. (cautioning that to exclude members
of the public based on what might happen “is too speculative to defeat the
appellant’s otherwise compelling Sixth Amendment right to have them present”).

As
for courtroom security, the court highlighted the absence of concrete facts—such
as prior public violence, a “documented history of disruptive or contumacious
conduct in the courtroom,” or a suggestion of threats made against court
participants—to support the trial court’s conclusion that security concerns were
heightened.  Id.  In concluding that the trial court’s findings were
insufficiently documented, the court observed that “[i]f the fact that emotions
might run high in the course of a locally sensational trial could alone justify
closure, a trial court would be entitled to exclude the public—not just from
voir dire proceedings but from entire trials—in any number of criminal cases.” 
Id.

2. 
Reasonable Alternatives

With
respect to the third Waller requirement, the trial court, not the
defendant, has the burden to consider reasonable alternatives to closure:

Trial courts are obligated to take
every reasonable measure to accommodate public attendance at criminal trials.  Nothing
in the record shows that the trial court could not have accommodated the public
at Presley’s trial.  Without knowing the precise circumstances, some
possibilities include reserving one or more rows for the public; dividing the
jury venire panel to reduce courtroom congestion; or instructing prospective
jurors not to engage or interact with audience members.

Presley,
130 S. Ct. at 725.

In Steadman,
the court of criminal appeals identified three alternatives that the trial
court, insofar as the record revealed, failed to consider sua sponte.  Steadman,
2012 WL 716010, at *8 (“That a trial court can reasonably discount some
alternatives, however, does not insulate it from Presley’s mandate that
it be able to sensibly reject ‘all reasonable alternatives’ before it
can exclude the public from voir dire proceedings.” (quoting Presley, 130
S. Ct. at 725)).  First, the court discussed the trial court’s failure to
consider dividing the venire panel to reduce courtroom congestion.  Id.  The
court also observed that the trial court did not consider instructing the
prospective jurors not to interact with audience members and that the record
revealed no concrete reason to believe that such an instruction “would lack
efficacy.”  Id. (concluding that if the trial court had both divided and
instructed the panel, any danger would have been “wholly defused”).  Finally,
the court pointed out that the trial court could have placed prospective jurors
in the jury box, allowing the family “to observe the voir dire from the seats
thus vacated in the gallery.”  Id.

C. 
Analysis

1. 
Overriding Interest

Just
as the trial court did in Steadman, the trial court in the present case
initially excluded Harrison’s family on the basis of overcrowding and made no
further explanation on the record before voir dire apart from agreeing with the
State’s assertion that seating both families in the jury box “may cause a
problem.”  See id. at *1–2.  Afterwards, when Harrison made his bill of
exception, the trial court stated that it “would consider it extremely
dangerous to have placed those people anywhere other than in the gallery.”[16]

We
acknowledge that courtroom security is indeed a substantial concern in the
abstract and could alone be “sufficiently momentous to warrant closure under
the appropriate circumstances.”  See Steadman, 2012 WL 716010, at *6. 
However, like in Steadman, the trial court failed to “identify specific
circumstances sufficient to remove its concerns
about . . . courtroom security from the realm of the
generic.”  See id.

Indeed,
even if the trial court adopted the State’s assertion that seating both families
together “may cause a problem,” this finding regarding what might happen is
inherently “too speculative to defeat [Harrison]’s otherwise compelling Sixth
Amendment right to have them present.”  See id. at *7.  And the trial
court’s statement that it “would consider” the families’ proximity to each
other to be dangerous is, without more, merely a statement of the trial court’s
belief or fear that cannot constitute an overriding interest under Steadman. 
See id.  The speculative and abstract nature of these statements is only
enhanced when we consider that nothing in the record suggests that the victim’s
family was even present and interested in attending voir dire.  See id.

In
addition to being speculative and abstract, neither of these findings specified
what the problem or danger might have been and, thus, failed to articulate a
tangible, actual, or impending threat.  See id. at *6–7.  As in Steadman,
the record lacks concrete facts such as “evidence of any outburst on the part
of the [parties’] family members,” a “history of such outbursts in prior court proceedings,”
prior public violence, a “documented history of disruptive or contumacious
conduct in the courtroom,” a suggestion of threats made against each other, or a
particular basis to suppose that the family members would speak to or otherwise
interact with each other because of their proximity.  See id. at *7;
Johnson v. State, 137 S.W.3d 777, 779 (Tex. App.—Waco 2004, pet. ref’d)
(holding that the trial court was acting to preserve an overriding interest to
protect the jury from improper influences when the trial court excluded the
defendant’s aunt from the courtroom after her actions had already threatened to
improperly influence the jury).  Although Harrison was standing trial for
capital murder, the Steadman court considered the defendant’s prior
public violence, not the alleged violence for which he was standing trial at
the time.  See Steadman, 2012 WL 716010, at *7.  And even if we were to consider
the nature of Harrison’s alleged crime, nothing in the record suggests that his
alleged violent character is transferable to his friend and family members.

The
only concrete fact in the record to support the closure is that there were
space limitations in the gallery, and even if we were to conclude that the
trial court reasonably expected violence to erupt between families in close
proximity to each other during an emotionally-charged trial, this would be
insufficient to justify closure.  See id. at *3, 7.  As Steadman
cautioned, if it were sufficient, “a trial court would be entitled to exclude
the public—not just from voir dire proceedings but from entire trials—in any
number of criminal cases.”  See id. at *6–7; Presley, 130 S. Ct.
at 725 (noting that if broad concerns were enough, “a court could exclude the
public from jury selection almost as a matter of course”).

Because
the threat to courtroom safety was speculative, abstract, and unsupported by tangible
evidence or concrete factual findings, the trial court failed to satisfy Waller’s
requirements to advance an overriding interest that closure was likely to
prejudice and to make findings adequate to support closure.  See 467
U.S. at 48, 104 S. Ct. at 2216; Steadman, 2012 WL 716010, at *5–7.

2.  Reasonable
Alternatives

Even
if the trial court had sufficiently documented facts to reasonably discount
Harrison’s first proffered alternative to closure, this did “not insulate it
from Presley’s mandate that it be able to sensibly reject ‘all
reasonable alternatives’ before it [could] exclude the public from voir dire
proceedings.”  See Steadman, 2012 WL 716010, at *8 (quoting Presley,
130 S. Ct. at 725).  Indeed, Harrison’s attorney was in the middle of offering
another alternative when the trial court interrupted him midsentence and
ordered the bailiff to bring the prospective jurors into the courtroom. 
Insofar as the record reveals, this alternative was one mentioned in Presley—seating
a few prospective jurors in the jury box, which would have allowed the two
families to concurrently but separately “observe the voir dire from the seats
thus vacated in the gallery.”  See id.

As
in Steadman, the trial court in this case also failed to consider sua
sponte the possibility of dividing the venire panel in half to reduce courtroom
congestion.  See id. (citing Presley, 130 S. Ct. at 725).  Also,
nothing in the record suggests that admonishing the families not to interact
with each other, much like the admonishment in Presley to the
prospective jurors not to interact with audience members, would have lacked
efficacy.  See id. (citing Presley, 130 S. Ct. at 725).  Indeed,
as in Steadman, combining more than one of these alternatives likely would
have defused any danger about which the trial court had concerns.  See id.

Therefore,
in addition to failing to satisfy Waller’s first and fourth
requirements, the trial court failed to satisfy Waller’s third
requirement to consider all reasonable alternatives to closure.  See 467
U.S. at 48, 104 S. Ct. at 2216.  Instead of the closure being a situation in
which the trial court took “special care” to strike a balance between competing
the interests, see id. at 45, 104 S. Ct. at 2215, the trial court excluded
Harrison’s family members and friend “almost as a matter of course.”  See Presley,
130 S. Ct. at 725.  Thus, we cannot say that this was one of the rare
circumstances in which the trial court was justified in excluding the public from
the voir dire proceeding.  See id. at 724 (citing Waller, 467
U.S. at 45, 104 S. Ct. at 2215).  Accordingly, the trial court violated Harrison’s
Sixth Amendment right to a public trial, see U.S. Const. amend. VI, and
we must sustain his first point.

3. 
Relief

The
State argues that even if the exclusion was unjustified, it was too trivial to
subvert the values of the public trial guarantee.  The Second Circuit has recognized
a triviality exception under which convictions are affirmed when exclusions,
while unjustified, are “deemed to be too ‘trivial’ to implicate the interests
protected by the Sixth Amendment right to a public trial.”  Steadman,
2012 WL 716010, at *9 n.41 (quoting United States v. Gupta, 650 F.3d
863, 864 (2d Cir. 2011)).  However, the court of criminal appeals held that
“[w]hen the constitutionally tainted portion of trial encompasses the entire
jury-selection process,” as it did here, “relief involves a new voir dire and a
new jury; perforce, it necessitates a new trial.”  Id. at *9. 
Accordingly, under Steadman, we are constrained to sustain Harrison’s
first point without considering whether the unjustified closure subverted the
values of the public trial guarantee.  See id. at *9 & n.41.

V.  Conclusion

Because
we overruled Harrison’s fifteenth point but sustained his first point, we
reverse the trial court’s judgment and remand the case to the trial court for a
new trial.[17]

 

 

PER CURIAM

 

PANEL: 
MCCOY,
GARDNER, and MEIER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED: March 29, 2012









[1]See Tex. R. App. P. 47.4.





[2]The details about how this
became a three-way conversation are disputed.  Melissa Perry, Madden’s
girlfriend, testified that Madden called Harrison, who was already talking with
Standberry; Madden testified that it was Harrison who called Madden rather than
Madden who called Harrison; and Standberry testified that Madden called him and
connected him with Harrison.





[3]Standberry testified that
the person on the phone identified himself as “Cliff,” and Harrison told
Lewisville Police Department Detective William Wawro that Cliff is his
nickname.





[4]Harrison told Detective
Wawro that a cubit is one-quarter pound of marijuana.





[5]Detective Wawro told
Harrison that based on the text messages sent and received between Harrison and
Madden, he knew the drugs involved were $500 an ounce.





[6]Harrison stated that he
was unemployed and that he lived with his eighty-year-old grandmother as well
as with his mother and his uncle, both of whom were unemployed.





[7]Harrison said that Madden
lived in Denton at the time.





[8]The last four digits of
Day’s cell phone number were 6239.





[9]The last four digits of
Dawson’s cell phone number were 0370.





[10]The last four digits of
Madden’s cell phone number were 4170.





[11]The last four digits of
Harrison’s cell phone number were 1836.





[12]This section of the penal
code provides in relevant part that “[a] person commits [capital murder] if the
person commits murder as defined under Section 19.02(b)(1)
and . . . the person intentionally commits the murder in
the course of committing or attempting to
commit . . . robbery.”  Id.





[13]The indictment alleged
that Harrison intentionally caused the death of Dawson by shooting him with a
firearm in the course of committing or attempting to commit the robbery of
Dawson.





[14]Section 29.02 of the
penal code provides in relevant part that a person commits robbery “if, in the
course of committing theft . . . and with intent to obtain
or maintain control of the property,
he . . . intentionally, knowingly, or recklessly causes
bodily injury to another.”  Tex. Penal Code Ann. § 29.02(a)(1) (West
2011).  Theft, in turn, involves an unlawful appropriation, which can be
satisfied by depriving the owner of his property without his effective
consent.  Id. § 31.03 (West Supp. 2011).





[15]Immediately
after the trial court refused to open the trial to the public, it granted
Steadman’s request to make a bill of exception “later on,” but Steadman never
pursued this bill.  Id.  On appeal, the State maintained that because
Steadman never pursued the bill, the lack of findings in the record was not the
State’s fault and that the cause should be remanded for additional fact
findings.  Id. at *2.  The court of appeals granted this motion, and the
trial court entered its findings accordingly.  Id. at *2–3.  When the
court of criminal appeals granted petition, it chose not to address the “thorny
issues” related to whether the court of appeals should have allowed the trial
court “to file supplemental findings of fact to retroactively justify a ruling
that the record reveals was originally made solely on the basis of an
inadequate concern for overcrowding.”  Id. at *5.





[16]To
the extent that it is argued that we should remand this case for findings of
fact the way that the court of appeals did in Steadman, we note that
Harrison made his bystander bill, while Steadman never pursued his bill.  See
id. at *2.  We also note that the trial judge who presided over this case
below is no longer sitting.  Cf. Taiwo v. State, No. 01-07-00487-CR,
2010 WL 2306040, at *3 n.2 (Tex. App.—Houston [1st Dist.] Sept. 29, 2010, pet.
ref’d) (mem. op., not designated for publication) (citing Garcia v. State,
15 S.W.3d 533, 535 (Tex. Crim. App. 2000) (“[I]t is not appropriate for the
second judge in the instant case to make findings of fact based solely on the
written transcript of the initial hearing.”)).





[17]Because these points are
dispositive, we need not address Harrison’s remaining points.  See Tex.
R. App. P. 47.1.