**Affirmed as Modified and Opinion Filed January 21, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-01664-CR

**LEMUEL MOSLEY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F11-57352-I**

## MEMORANDUM OPINION
Before Justices Francis, Evans, and Stoddart
Opinion by Justice Francis

Lemuel Mosley was indicted on a charge of capital murder after a security guard was shot to death during a restaurant robbery. A jury convicted appellant of the lesser-included offense of murder, and the trial court sentenced him to life in prison. In two issues, appellant challenges the legal sufficiency of the evidence to support his conviction and the denial of his motion for mistrial. In a third issue, he seeks to modify the judgment to reflect his conviction for a first-degree felony, instead of a capital felony. We sustain the third issue but conclude the remaining two are without merit. We modify the trial court's judgment and affirm the judgment as modified.

Juan Garcia was the manager of the Wingstop located in a shopping center on South Buckner Road in Pleasant Grove. Just before midnight on May 10, 2011, appellant came into the

restaurant wearing a red mask and carrying a pistol and bag. Appellant gestured for Garcia to get down. He then went to the kitchen area where he found two workers, Clementina Reyes Casas and Ema Rodriguez. He told the women to get on the floor and asked if they had money. He also wanted to know if anyone else was in the building and when they told him no, appellant returned to the front. There, he told Garcia to open the cash register and safe. While appellant put the money in his bag, Garcia knelt on the floor with his hands on his head.

About that time, the shopping center's security guard, Robert St. Clair, entered the restaurant and interrupted the robbery. St. Clair shot twice at appellant, who threw down his gun and ran to the back of the restaurant. The kitchen workers then fled out the front door. Juan Ortiz, who worked nearby, heard a shot and saw the two Wingstop employees run from the restaurant.

Ortiz went to see what was happening and saw St. Clair inside the Wingstop. While Ortiz stayed at the front of the restaurant, Garcia and St. Clair went to the back to look for appellant. Garcia doubted appellant had escaped because the back door was locked and could only be opened with a key. They found appellant hiding behind a door. St. Clair told appellant to put his hands behind him and get on the floor. As appellant was lying on the floor, St. Clair gave Garcia his gun so he could get his handcuffs. Garcia held the gun "only for seconds" before he told St. Clair he could not "hold this gun" and tried to hand it back. At that point, appellant got up "real quick" and grabbed Garcia's hand. The three men then struggled over the gun. Garcia said he went down on one knee, and appellant had the gun. He asked appellant "[n]ot to do it," but appellant shot him. Garcia tried to block the bullet with his arm and was shot in the hand and face. After he was shot, Garcia said he was "stunned" and "blacked out" for a few seconds. When he came to, St. Clair was lying motionless on the floor beside him and appellant was pointing the gun at Garcia's head. Garcia told appellant "to stop." Appellant

pulled the trigger, but the gun only "clicked" because it was out of bullets. Appellant then ran out of the restaurant.

Ortiz heard the gunshots and ran to his car and called the police. He was backing his car out of the parking lot when appellant ran out of the Wingstop, pointed his gun at him, and then fled on foot. St. Clair died of a gunshot wound to the front of his neck. According to the medical examiner, the barrel of the gun was "up against the skin" when the bullet was fired. Garcia sustained injuries to his face and hand; the injuries required he undergo three surgeries.

The restaurant had multiple motion-activated cameras, but there were no cameras in the hallway where the shooting occurred. The surveillance video was admitted into evidence and showed appellant entering the restaurant, masked, and holding what appeared to be a gun. It showed him pointing the gun at the kitchen workers, who got down on the floor. Garcia was seen opening the safe and appellant putting money in the bag. About three minutes into the robbery, St. Clair entered the restaurant and approached the counter. The video showed appellant get up from the floor and point his gun in the direction of St. Clair, who then apparently fired at appellant. Appellant ran to the back of the restaurant with St. Clair in pursuit. The video showed St. Clair moving through the restaurant with his gun drawn before returning to the front and talking to Ortiz. While Ortiz stayed up front, the video showed St. Clair and Garcia walking through the kitchen area. About one minute later, appellant is seen running from the back, stopping at the safe to pick up his pistol and bag of money, and leaving the restaurant. As he was leaving, appellant pointed his gun in the direction of the parking lot.

Hector Briones lived around the corner from the Wingstop. At about midnight, a man banged on his window and said "someone was trying to kill him." Briones heard the doorknob turning. He called the police, who ultimately matched a print on his door with appellant's palm print. Although the police searched the area that night, they did not find appellant.

Several hours later, once the sun was up, officers went back to the area and found a red bandana and two guns in the storm drain. One of the guns was a pellet gun or BB gun. The other was St. Clair's .38-caliber revolver. The revolver held five bullets and all rounds had been fired. Evidence at the crime scene showed two shots were fired in the entryway of the restaurant, a third bullet entered the ceiling, and a fourth was found on the floor to the entrance of the hallway to the back of the store. The fifth bullet was found in St. Clair's body, and a firearms examiner linked the bullet with the revolver. A pair of open handcuffs was found near St. Clair's body.

The lead investigator on the case, Detective Claude Philip Harding, connected appellant to the robbery through the palm print found on Briones's door. Harding interviewed appellant, and the interview was recorded and admitted into evidence. In the interview, appellant initially denied involvement in the Wingstop shooting. Then, he told Harding he went to Wingstop with a fake gun, demanded the money, and the manager gave him the money. On his way out, St. Clair came in and told him to "freeze, motherfucker." Appellant said he told St. Clair his gun was not real and dropped it, but St. Clair shot at him twice anyway. Appellant said he ran to the back of the restaurant, but there was "no way out." St. Clair and Garcia found him, and appellant said he did not resist the men until St. Clair choked and hit him and Garcia kicked him. Appellant said St. Clair gave his gun to Garcia, and appellant grabbed it from Garcia. During a struggle, appellant said the gun went off under St. Clair's neck. Appellant said he and Garcia then "wrestled" over the gun and it went off, injuring Garcia. Appellant grabbed "all of his stuff" and ran out of the Wingstop. Appellant said the "gun" he took to the robbery was a plastic gun that he bought for $15 and he did not intend for anyone to be harmed.

In his first issue, appellant contends the evidence is insufficient to support his conviction for murder. Appellant asserts the evidence showed he had no intent to kill anyone when he

–4–

entered the Wingstop with a toy gun. He argues St. Clair was killed in a struggle over his own gun only after appellant had been shot at twice. Thus, appellant argues, he was "fighting for his life" when the two men were shot, one fatally, and he is guilty only of aggravated robbery. He also asserts Garcia gave conflicting testimony about the sequence of events but consistently acknowledged that he did not see "who shot Robert St. Clair or how it occurred."

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* Direct and circumstantial evidence are treated equally. *Id.*

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1). Here, the jury charge limited the culpable mental state in this case to "knowingly" so the State had to prove appellant knowingly caused the death of Robert St. Clair by shooting him with a firearm. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Murder is a "result of conduct" offense, which means the culpable mental state relates to the result of the conduct – causing the death. *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b). Mental culpability is of such a nature that it generally must be inferred from the circumstances under which the prohibited act occurred. *Dillon v. State*, 574

S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978); *Russo v. State*, 228 S.W.3d 779,793 (Tex. App.—Austin 2007, pet. ref'd). A person's knowledge and intent may be inferred from the acts, words, and conduct of the accused. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Having reviewed the evidence and, in particular, appellant's conduct before, during, and after the shooting of St. Clair, we conclude it is sufficient for a jury to find beyond a reasonable doubt that appellant was aware his conduct was reasonably certain to cause St. Clair's death. St. Clair walked into the restaurant while appellant was robbing it armed with what appeared to be a real gun. Appellant pointed his weapon at St. Clair, and St. Clair shot at appellant. Appellant ran to the back of the restaurant and was found hiding behind a door. As St. Clair was preparing to handcuff him, he handed his gun to Garcia, who quickly tried to hand it back. Appellant tried to grab the gun, a struggle ensued and appellant shot Garcia. Garcia momentarily blacked out and awakened to find appellant pointing the gun at his head and St. Clair dead on the floor beside him. St. Clair had been shot at close range in the neck. Garcia testified appellant tried to shoot him again, but the gun only clicked because all the bullets had been fired. As appellant fled the restaurant, he picked up his bag containing the $4,000 taken from Wingstop and then pointed his gun at Ortiz, who was in his car in the parking lot.

Although Garcia did not witness the shooting of St. Clair, a jury could have inferred from all the facts that appellant, while attempting to flee the restaurant, put the gun to St. Clair's neck and fired, just as he tried to shoot Garcia in the head but was out of bullets. Further, the jury could have determined appellant's conduct was reasonably certain to cause St. Clair's death. To the extent Garcia's version of events differed from appellant's, the jury was entitled to judge the witnesses' credibility and determine who was more believable. And, to the extent Garcia's testimony contained inconsistencies, the jury was entitled to resolve those inconsistencies in the

State's favor. Because the evidence is legally sufficient to support appellant's conviction for murder, we overrule the first issue.

In his second issue, appellant argues the trial court erred in denying his motion for mistrial, alleging the State improperly commented on his Fifth Amendment right to remain silent and failure to testify.

During voir dire, the prosecutor asked prospective jurors what they believed the police might want to do during the investigation of "this type" of case, the questions they might ask, and the persons they might want to interview. In this context, the prosecutor asked whether jurors thought the police would want "to interview the person that is accused of committing the crime." Appellant objected that the question was a "Fifth Amendment comment," and the prosecutor responded it was "a question based on investigation." The trial court overruled the objection. The prosecutor then rephrased the question, asking "what types of - - what would you expect - - anticipate an officer to do if he's trying to interview the person accused?" Appellant again objected that it was "a comment on the Fifth Amendment," and the trial court sustained the objection. Appellant moved for a mistrial, which the trial court denied. Appellant did not ask the judge to instruct the jury to disregard the statement before or after seeking a mistrial.

On appeal, appellant asserts that by telling the jury panel that the accused "should be interviewed can only construed as a statement" on appellant's failure to testify. A comment on a defendant's failure to testify violates both the state and federal constitutions as well as Texas statutory law. *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). In assessing whether a defendant's Fifth Amendment right has been violated, the courts view the offending language from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear. *Id.* It is not sufficient that the language might be construed as an implied or indirect allusion. *Id.* The test is whether the language used was

manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. *Id.* In applying this standard, we consider the context in which the statement was made to determine whether the language used was of such a character. *Id.*

Here, we question whether the State's remark was improper. In context, it appears the State was discussing with jurors what they would expect in a thorough police investigation. We note the record shows police did interview appellant, who agreed to talk them. The interview was recorded and was ultimately shown to the jury. So, to the extent appellant's complaint concerns his right to remain silent during the interrogation process, he waived that right. To the extent appellant's complaint argues the question was a comment on his failure to testify at trial, it is unlikely the prospective jurors would have necessarily and naturally taken it as such a comment, given the context of the question as well as the fact that it was made during voir dire, before a single witness had testified. *See Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001) (acknowledging timing can be factor to consider in determining whether comment was comment on a failure to testify).

Nevertheless, assuming the question was improper, appellant only moved for a mistrial; he did not request the less drastic measure of an instruction to disregard. When a party's first action is to move for mistrial, the scope of appellate review is limited to the question of whether the trial court erred in not taking the most serious action of ending the trial; in other words, an event that could have been prevented by timely objection or cured by instruction to the jury will not lead an appellate court to reverse a judgment on appeal by a party who did not request these lesser remedies in the trial court. *See Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). Generally, a prompt instruction to disregard to disregard will cure error associated with an improper question or comment, including a question posed at voir dire. *Dancer v. State*, 253

–8–

S.W.3d 368, 373 (Tex. App.—Fort Worth 2008, pet. ref'd). Nothing in this record suggests the comment was so inflammatory that an instruction to disregard would not have cured it. *Cates v. State*, 752 S.W.2d 175, 176 (Tex. App.—Dallas 1988, no pet.) (error cured by instruction to disregard when prosecutor, in voir dire, commented on defendant's right to remain silent). Consequently, we conclude appellant has forfeited his complaint. *See Young*, 137 S.W.3d at 69. We overrule the second issue.

In his third issue, appellant requests the judgment be reformed to reflect his conviction for a first-degree felony. The judgment recites the degree of offense as capital felony. In addition, it shows the jury assessed punishment. The record, however, reflects appellant was convicted of murder, a first-degree felony, and was sentenced by the trial court.

This Court has the authority to correct the judgment of the court below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we sustain the third issue and modify the judgment to reflect (1) the degree of offense as a first-degree felony and (2) punishment was assessed by the trial court.

We affirm the trial court's judgment as modified.


Do Not Publish
TEX. R. APP. P. 47.2(b)                                    /Molly Francis/
131664F.U05                                                MOLLY FRANCIS
                                                           JUSTICE

–9–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

LEMUEL MOSLEY, Appellant

No. 05-13-01664-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas
Trial Court Cause No. F-1157352-I.
Opinion delivered by Justice Francis;
Justices Evans and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect (1) the degree of offense as a first-degree felony and (2) punishment was assessed by the trial court.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered January 21, 2015.